**In re FRESH APPROACH, INC., Debtor.**

**Bankruptcy No. 385–30293–F–11.**

United States Bankruptcy Court, N.D. Texas, Dallas Division.

July 25, 1985.

M. Bruce Peele, Jones & Brutsche, Dallas, Tex., for debtor.

Bruce W. Akerly, Toby L. Gerber, Dallas, Tex., for Standard Fruit and Vegetable.

## MEMORANDUM OPINION

JOHN C. FORD, Bankruptcy Judge.

On February 13, 1985, Fresh Approach, Inc. (hereinafter "Debtor"), filed its petition for relief under Chapter 11 of the Bankruptcy Code. Debtor operated, and continues to operate as Debtor-In-Possession, a market featuring a variety of fresh produce and other groceries. In the course of its operations Debtor had for several years purchased produce from Standard Fruit and Vegetable (hereinafter "SF & V"). Just prior to the filing of its petition for relief, Debtor ordered and received a number of shipments of various perishable commodities from SF & V. Unfortunately, Debtor's financial circumstances were such that SF & V's invoices remained unpaid long after they became due. SF & V demanded payment but received no response. Fearing that its claim might be considered subordinate to claims of Debtor's secured creditors in bankruptcy proceedings, SF & V sought to invoke the trust provisions of Perishable Agricultural Commodities Act of 1930, as amended in 1984. *See* 7 U.S.C. 499e(c). Notice was sent to Debtor and to the Secretary of Agriculture, pursuant to the terms of the statute, on December 5, 1984. On February 19, 1985, SF & V filed its Motion for Relief from Stay and for Turnover of Property Not Part of Debtor's Estate, alleging *inter alia* that the transactions giving rise to SF & V's claim occurred after and were controlled by the amendments to the PACA. Debtor opposed the motion on the grounds that the amendments were not self-implementing, that the implementing regulations took effect on December 20, 1984, and that because the transaction in question preceeded this date, SF & V was not eligible to invoke the trust provisions of the amendments. Both parties cite statements in the legislative histo-ry of the amendments in support of their contentions.

On April 30, 1985, this Court entered an opinion holding that the 1984 PACA trust amendments applied to the transactions underlying SF & V's claims, and that Debtor's produce related inventory and proceeds thereof were to be considered held in trust for the benefit of SF & V. *See In re Fresh Approach, Inc.*, 48 B.R. 926, 12 B.C.D. 1365 (Bkrtcy.N.D.Tex.1985). Said inventory was therefore not to be considered property of the estate, and was to be turned over to SF & V upon final determination of the extent to which SF & V's claims were eligible under the PACA amendments.

On June 6, 1985, trial was held, over Debtor's objections as to this Court's jurisdiction and despite Debtor's motion for continuance, to determine the amount of SF & V's claim against the trust assets. This opinion represents findings of fact and conclusions of law resulting from the Court's consideration of the evidence and arguments presented at that trial.

### A. *Withdrawal of Reference*

At the outset, it must be noted that Debtor has raised questions concerning the ability of this Court to resolve the factual and legal issues that have been and likely will be raised. Shortly before trial, and approximately sixteen days after the Court found the trust provisions of the 1984 PACA amendments applicable to these transactions, Debtor filed its motion for removal (in substance, a motion for withdrawal of reference) pursuant to 28 U.S.C. 157(d). This statute, enacted as part of the Bankruptcy Amendments and Federal Judgeship Act of 1984 (hereinafter "BAFJA"), P.L. 98–353 (1984), provides, in pertinent part,

> The district court shall, on timely motion of a party, ... withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both Title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce.

While the terms of this provision leave little doubt that it is the district court, and

not the bankruptcy court, which is to determine whether a particular proceeding shall be withdrawn, two points are worthy of mention. First, it would appear that the PACA trust provision is not a statute "regulating organizations or activities." Use of the word regulating would appear to imply a function of a governmental unit with respect to the preservation or enforcement of a *public* right. The PACA trust creates a *private* right of action, and gives produce creditors an opportunity to protect and preserve their own *private* rights to payment. The Court further notes the following excerpt from the admittedly scanty legislative history of the debate in the House of Representatives concerning Section 157(d).

> MR. KRAMER: I note that the gentlemen's amendment at section 104(a) creates a new section 157 in the Bankruptcy Code.... My question is this: the language "activities affecting interstate commerce" is very broad language. What kinds of situations or circumstances does the gentleman intend to cover here? Or will this language become an escape hatch through which most bankruptcy matters will be removed to a district court?
>
> MR. KASTENMEIER: I thank the gentleman for his question. This language is to be construed narrowly. It would, for example, mean related causes which may require consideration of both title 11 issues and other Federal laws involving the National Labor Relations Act, civil rights laws, Securities and Exchange Act, civil rights laws, Securities and Exchange Act of 1934, and similar laws.

130 CONG.REC.H. 1850 (daily ed. March 21, 1984).

As explained more fully below, this is not a "related" proceeding as that term is used in BAFJA. Rather, this is a core proceeding, arising under Title 11. Moreover, the examples cited by Representative Kastenmeier in his explanation of Section 157(d) provide for active intervention by governmental agencies occupying a watchdog role pursuant to a regulatory mandate. While PACA does direct the Secretary of Agriculture to promulgate regulations and, under certain circumstances, play an active role, the trust provisions of the 1984 PACA amendments require no such activity. At issue here is a private action between two private entities, and not a regulatory action by the Department of Agriculture.

 Second, the Court notes that a motion to withdraw reference must be timely. No standards are set forth in the statute for the definition of a "timely" motion to withdraw. There is some indication, however, that motion to withdraw reference should not be used as a vehicle to protract litigation and delay controversies.

> The district court should refuse withdrawal if withdrawal would unduly delay administration of the case, considering the status of the case, the importance of the proceeding to the case, and the relative caseloads of the district court and bankruptcy judge.

130 CONG.REC.S. 6081 (daily ed. June 19, 1984). Debtor seeks to withdraw on the basis that this Court is not empowered to consider the Bankruptcy Code in conjunction with PACA, yet Debtor did not file its motion until sixteen days after this Court's decision resolving the legal questions requiring consideration of the Code and a law of the United States which arguably regulates activities affecting interstate commerce. SF & V filed its motion some sixty-five days before the Court rendered its opinion, and Debtor filed its response more than twenty days before this Court's decision. At no time prior to the decision did Debtor seek or even discuss withdrawal of reference. The motion was not filed until two weeks after the very event Section 157(d) was allegedly intended to avoid. Under the circumstances, it can hardly be said that Debtor's motion is timely. "(I)f a motion for withdrawal of reference is not timely made, it will almost certainly be held that the provisions of the second sentence of section 157(d) have been waived." 1 *Collier on Bankruptcy* ¶ 3.01(e) (15th ed. 1984). *Cf. Matter of Baldwin United Cor-*

*poration,* 43 B.R. 888, 889 (Bkrtcy.S.D. Ohio 1984).

These matters, as stated earlier, are fodder for digestion by a higher authority. They are significant, however, in the resolution of another threshold question, i.e., whether this Court can or should proceed with the matters at issue during the pendency of a motion to withdraw reference. Debtor has filed a motion for continuance on precisely this basis. SF & V has opposed a continuance, but has cited no authority.

This Court has found no caselaw addressing Debtor's contentions. It must be noted, however, that the 1984 amendments dealing with bankruptcy procedure and jurisdiction were essentially modeled after the emergency rules adopted by every district court in the wake of *Northern Pipeline Construction Company v. Marathon Pipeline Company,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). Consequently, the provisions of those rules and the caselaw thereunder is worthy of some consideration.

The Local Rule of the Northern District of Texas Concerning Bankruptcy Cases and Proceedings, filed December 23, 1982, stated in pertinent part,

> The reference to a bankruptcy judge may be withdrawn by the district court at any time on its own motion or on timely motion of a party. *A motion for withdrawal of reference shall not stay any bankruptcy proceeding before a bankruptcy judge unless a specific stay is issued by the district court.*

(Emphasis added). In *In re B.T. Wilson Drywall Construction, Inc.,* 36 B.R. 439 (E.D.Ark.1983), a secured creditor moved for withdrawal of reference and asserted that such a motion automatically effected removal of all pertinent issues from the bankruptcy court to the district court. The court, operating under a local rule identical to that set forth above, stated that the purpose of the rule was to take advantage of the special expertise of the bankruptcy courts pending a determination by the district court, and to generally expedite proceedings. Accordingly, the court determined that the motion to withdraw reference did not deprive the bankruptcy court of its jurisdiction over pending proceedings.

Unfortunately, this Court is not presented in Section 157(d) with guidelines as specific as those set forth in the emergency rule. An argument may be made that the absence in BAFJA of a provision present in the emergency rules indicates a Congressional desire to consciously eliminate that provision. *See, e.g., In re Baldwin-United Corporation,* 48 B.R. 49, 12 B.C.D. 913 (Bkrtcy.S.D.Ohio 1985) (absence of proscription against jury trials in BAFJA, following presence of proscription against jury trials in emergency rules, an important factor in upholding power of bankruptcy courts to hold jury trials). Indeed, the local rule promulgated by the district courts of the Northern District of Texas following enactment of BAFJA provides only that

> any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 . . . be and they hereby are referred to the Bankruptcy Judges of this district for consideration and resolution consistent with law. It is further ordered that the Bankruptcy Judges for the Northern District have been, and they hereby are, directed to exercise the authority and responsibilities conferred upon them as Bankruptcy Judges by (BAFJA) and this court's order of reference. . . .

It may thus be surmised that this Court is not awash with guidance. Looking again to the precise terms of Section 157(d), the Court notes that a proceeding will be withdrawn "if the court determines" that withdrawal is appropriate. The statute thus implies that the determination must precede actual withdrawal, and that until the determination is made the case is not withdrawn. If the proceeding is not withdrawn, it remains before the bankruptcy court, and there would seem to be no basis to stay further proceedings in the bankruptcy court. This is particularly true given the Court's estimate of the decision like-

ly to be reached by the district court. Accordingly, this Court will, and hereby does, deny Debtor's motion for continuance, and will proceed with the resolution of the remaining issues.

## B. *Core Proceedings*

Debtor filed, on the day of trial, a "Notice of Intention to Invoke Section 157(c)", by which Debtor indicated its refusal to consent to the entry by this Court of final judgment in these matters, apparently on the basis of Debtor's assertion that this is not a core proceeding and that this Court is therefore without power to enter a final order absent consent of the parties. SF & V suggested at trial that this is a core proceeding because it is an action to turnover property, apparently relying upon Code Section 542, and is therefore a proceeding arising under title 11. Although this Court finds SF & V's reliance upon section 542 without merit and completely inapposite, the Court nonetheless concludes that these proceedings are core proceedings and that any order set forth herein is final.

■ One of the most confusing aspects of BAFJA is the attempt in 28 U.S.C. 157 to define the jurisdiction of the bankruptcy court consistent with the principles announced in the *Marathon* decision. The subsection to which Debtor refers, 28 U.S.C. 157(c), states, in pertinent part,

A bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11. In such proceeding, the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district court after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected.

By contrast, a bankruptcy court has the power and the duty to enter a final judgment in proceedings which qualify as core proceedings. *See* 28 U.S.C. 157(b)(1). A laundry list of core proceedings is provided by the statute, including "orders to turn over property of the estate." It is upon the latter provision, presumably in combination with Code section 542, that SF & V rests its contention that this dispute is a core proceeding. The Court notes first that both Section 542 and Section 157(b)(2)(E) refer to orders regarding turnover of "property of the estate". SF & V has continuously asserted, and this Court has found, that the produce related assets held in trust by Debtor are not property of the estate. The sections cited by SF & V could not, by their terms, apply to this case, as they are concerned only with the turnover of property of the estate by third parties. Moreover, the turnover contemplated by these sections is *to*, rather than *from*, the debtor. Were this the only basis for evaluating the core-noncore character of these proceedings, Debtor's "notice" would effectively deprive this Court of the ability to make a final determination.

There are, however, three additional bases not cited by SF & V but nonetheless recognized by this Court, for concluding that this is a core proceeding. First, Section 157(b)(2)(G) specifies that motions for relief from the automatic stay are core proceedings. SF & V's motion was styled as a motion to lift the stay, and the property against which SF & V seeks to enforce its claims is held by Debtor. Bankruptcy Code Section 362(a)(3) stays "any act to obtain possession of ... property *from* the estate...." (emphasis added). Because Debtor therefore has, at the least, a possessory interest in the property at issue, relief from the stay was a prerequisite to any further action by SF & V. Debtor contends, however, that SF & V's motion is a wolf in sheep's clothing, i.e., an action for a declaratory judgment disguised as a motion to lift the stay. Consequently, this matter should have been brought as an adversary proceeding, under Bankruptcy Rule 7001, rather than as a contested matter under Rule 9014, and is not properly a core proceeding. While there may be some merit to Debtor's argument, there remain other grounds upon which SF & V could have

built an argument, and upon which this Court bases its decision.

In addition to the specifically enumerated examples of core proceedings under new Section 157, there exists a residual category, Section 157(b)(2)(O), which includes as core matters "other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, except personal injury tort or wrongful death claims." It should be obvious that the present proceeding is one which adjusts the debtor-creditor relationship, and which is therefore a core proceeding under the foregoing provision. In *In re Richmond Children's Center, Inc.,* 49 B.R. 262 (S.D.N.Y. 1985), the movant sought turnover of funds held by the debtor and allegedly subject to a state law constructive trust in favor of movant. Holding that the proceeding was a core proceeding, the court stated that "[t]he instant action for a constructive trust is akin to those 'matters concerning the administration of the estate' and 'proceedings affecting ... the adjustment of the debtor-creditor ... relationship' which are set forth as examples of core proceedings in which bankruptcy judges may enter dispositive orders and judgments." 49 B.R. at 264. While the case at bar is concerned with a federal statutory trust, as opposed to a state law constructive trust, it remains clear that this is a core proceeding under Section 157(b)(2)(O).

The decisions construing Section 157 seem to indicate a judicial inclination to resolve doubt as to core-noncore status in favor of classification of a matter as a core proceeding. *See, e.g., In re Lion Capital Group,* 46 B.R. 850, 12 B.C.D. 840 (Bkrtcy. S.D.N.Y.1985); *In re Criswell,* 44 B.R. 95, 12 B.C.D. 653 (Bkrtcy.E.D.Va.1984); *In re Lawson,* 42 B.R. 206, 12 B.C.D. 62 (Bkrtcy. E.D.Ky.1984). There is support for this inclination in the legislative history, in which noncore proceedings are consistently referred to as a "narrow range" of matters. *See* 130 CONG.REC. H7494 (daily ed. June 29, 1984) (remarks of Rep. kastenmeir). At least two commentators have read the provisions of section 157 to give

the bankruptcy courts the authority to render a final decision, subject to normal standards of review (as opposed to the de novo standard in noncore cases) in any matters "arising under" title 11. *See* Hendel and Reinhardt, *Evolution of Bankruptcy Court Jurisdiction after the Bankruptcy Amendments and Federal Judgeship Act of 1984,* 90 Com.L.J. 272 (1985); Kamp, *Court Structure Under the Bankruptcy Code,* 90 Com.L.J. 203 (1985). Although this provision was never cited by SF & V, the Court notes that the relief requested herein falls within the parameters of Bankruptcy Code section 541(d), which defines the extent to which property, legal title to which is held by debtor but equitable title to which is held by others, is property of the estate.

▆ Here, of course, Debtor has what amounts to legal title, by virtue of its possession of the produce inventory and proceeds thereof, and as discussed below and in this Court's previous ruling, SF & V holds an equitable interest in those assets. This is precisely the situation contemplated by Section 541(d). As a result, this proceeding is a matter arising under Title 11, and is therefore a core proceeding. *Cf. In re Martin Fein & Company, Inc.,* 43 B.R. 623, 628–29 (Bkrtcy.S.D.N.Y.1984); *In re Kaiser,* 722 F.2d 1574, 1582 (2d Cir.1983); *In re Cohn Brothers, Inc.,* 45 B.R. 723, 725 (Bkrtcy.M.D.Penn.1985).

### C. *PACA Trust Assets are not Property of the Estate*

As noted above, this proceeding is a core proceeding by virtue of Bankruptcy Code Section 541(d), which states, in pertinent part,

> Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest, ... becomes property of the estate ... only to the extent of the debtor's legal title to such property, *but not to the extent of any equitable interest in such property that the debtor does not hold.*

11 U.S.C. 541(d) (emphasis added).

This Court previously held that the provisions of the 1984 PACA amendments allow

for the creation of a trust for the benefit of unpaid produce creditors, such as SF & V, so long as such beneficiaries perfect their interests pursuant to the statute or its implementing regulations.[1] This Court has also determined that SF & V perfected its interest in this trust in December, 1984, approximately sixty days prior to the entry of an order for relief in this case, and that the produce related assets (and proceeds thereof) which formed the corpus of said trust would not be considered property of the estate.[2] That the corpus of a trust is not property of the estate is so widely accepted as to be beyond dispute.

> The rule is elementary that the estate succeeds only to the title and rights in the property that the debtor possessed, although the trustee is armed, of course, with the special rights and powers conferred upon him by the Code itself. Therefore ..., the estate will generally hold such property subject to the outstanding interest of the beneficiaries.

4 *Collier on Bankruptcy*, 541.13 at 541–66 (15th ed. 1983). *See Georgia Pacific Corporation v. Sigma Service Corporation*, 712 F.2d 962, 968 (5th Cir.1983); *Matter of Quality Holstein Leasing*, 752 F.2d 1009, 1012 (5th Cir.1985); *In re Kennedy & Cohen, Inc.*, 612 F.2d 963, 965 (5th Cir.1980), *cert. den. sub. nom. Wisconsin v. Reese*, 449 U.S. 833, 101 S.Ct. 103, 66 L.Ed.2d 38 (1980). As a result, the beneficiary of such a trust would be entitled "to priority in payment as to all the assets of the bankrupt, ahead of the claims of creditors who have valid security interests, ahead of the administrative costs and expenses incurred in this court and ahead of all other priority and general creditors." *In re Kennedy & Cohen, Inc., supra*, at 965.

Seizing upon these principles, SF & V seeks to recover from Debtor's inventory, or the proceeds thereof, the amount of its interest in the trust. Debtor, with help from the unsecured creditors' committee, protests, citing the legislative history of the 1984 PACA amendments [3] for the proposition that the trust is a "floating" trust, that Debtor is entitled to the use of said assets in the ordinary course of its business, and that the interest asserted by SF & V may be treated, albeit in full, under the plan of reorganization. Not surprisingly, SF & V is not overly enamored of this proposal, and wants immediate payment.

Because of the youth of the PACA amendments, there is a dearth of caselaw regarding the interplay of PACA and the Bankruptcy Code. Consequently, this Court has often found itself sailing hitherto uncharted waters, and has relied frequently upon analogies drawn to similar rights and circumstances involving other statutes and doctrines. For example, much has been written about the rights of beneficiaries of constructive trusts comprising assets held by debtors or trustees in bankruptcy. The cases have consistently held that the estate's interests are subordinate to the claims of beneficiaries. Provided the latter can satisfactorily prove their entitlement, it seems well settled that their demands for payment must be honored. "(T)he trustee (may be required) to turn over to the beneficiary of a state law constructive trust the property that the debtor holds subject to such a trust ... (t)he debtor retains legal title, but the constructive trust beneficiary may reclaim in full his equitable interest in bankruptcy proceedings." *Matter of Quality Holstein Leasing, supra* at 1012 (citing *Georgia Pacific*, 712 F.2d at 968).

Another landmark by which this Court has sought to navigate has been the trust provision of the Packers and Stockyards Act, 7 U.S.C. 196, (PSA) and cases thereunder.[4] Interestingly, this ancestor of the

---

1. *In re Fresh Approach*, 48 B.R. 926 (Bkrtcy.N.D. Tex.1985).

2. *Id.*

3. H.R.Rep. No. 98–543, 98th Cong., 1st Sess. 4 (1983), *reprinted in* 1984 U.S.Code Cong. & Admin.News 405, 407.

4. Congress directed courts to look to caselaw developed under PSA for guidance as to proceedings arising under PACA. *See* note 3 *supra*.

PACA trust in dispute in the instant case was expressly mentioned by Congress in its analysis of Bankruptcy Code Section 541(d).

> Situations occasionally arise where property ostensibly belonging to the debtor will actually not be property of the debtor, but will be held in trust for another. For example, if the debtor has incurred medical bills that were covered by insurance, and the insurance company had sent the payment of the bills to the debtor before the debtor had paid the bill for which the payment was reimbursement, the payment would actually be held in a constructive trust for the person to whom the bill was owed. (Section 541) ... also will not affect various statutory provisions that give a creditor of a debtor a lien that is valid outside as well as inside bankruptcy, or *that creates a trust fund for the benefit of creditors of the debtor. See Packers and Stockyards Act section 206, 7 U.S.C. 196.*

H.R.Rep. No. 95–595, 95th Cong. 1st Sess. (1977) 368, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5868 (emphasis added).

This express exclusion of trust assets from property of the estate indicates that Congress intended a priority scheme consistent with that applied in cases of judicially imposed constructive trusts, i.e., that assets subject to the PSA (and by analogy, the PACA) trust were not property of the estate, and were subject to distribution outside the distribution contemplated in bankruptcy. In *In re Gotham Provision Company, Inc.*, 669 F.2d 1000 (5th Cir.1982) this principle was applied in a consideration of the relative priorities of trust beneficiaries and secured claimants. "The Committee intended that the (PSA trust) be a constructive statutory trust arising by operation of law." 669 F.2d at 1012, footnote 14. The court affirmed rulings by the bankruptcy and district courts permitting the claimants to recover the unpaid balance from sales of livestock from the trust assets themselves, whether held in escrow by the debtor or paid over to a third party.

*Cf. Matter of Harmon,* 11 B.R. 162, 166–67 (Bkrtcy.N.D.Tex.1980).

Indeed, to hold otherwise would be to defeat the very purpose of the PSA and PACA trusts. Debtor contends that it should be permitted to retain the use and possession of the trust assets pending formulation and approval of a plan of reorganization, through which SF & V's claim would be satisfied. Leaving aside the speculative nature of this contention (i.e., Debtor operates under the yet untested assumption that a plan will be forthcoming and will be approved), it is clear that Debtor's scenario would at best grant SF & V *parity* with the other creditors and administrative claimants. It is clear from the terms of the PACA amendments and from the supporting legislative history that Congress intended to create a *priority* status for unpaid produce claimants, priming even the administrative claims which normally stand first in line in a bankruptcy distribution. To approve a plan which grants anything but such a priority would be in direct contravention of the purpose and intent of the PACA amendments. It must be remembered that PACA was not enacted to protect those in Debtor's shoes, but rather to prevent the chaos and disruption in the flow of perishable agricultural commodities sure to result from an industry-wide proliferation of unpaid obligations. While in isolation this may seem a harsh course to follow, in the macroeconomic sense PACA serves to ensure continuity of payment and therefore survival of the industry. Congress has plainly decided it would be less disastrous to risk the liquidation of a single purchaser than to threaten the entire production chain with insolvency. It is not the function of this Court to pass upon the wisdom of that decision.

Of course, it is this Court's task to balance the rights of various claimants against the Bankruptcy Code's bias in favor of efforts to reorganize a debtor. In this case, assuming Debtor's plan proposed to pay SF & V the indubitable equivalent of its interest in the trust assets, with due regard for the time value of money, an argument could be made that SF & V

would receive all that it could reasonably expect, under the circumstances. Such an argument might find support in *In re Goldblatt Brothers, Inc.*, 33 B.R. 1011 (N.D.Ill. 1983), where the court, after concluding that Debtor held certain funds as trustee for the claimant, awarded the claimant an administrative priority. This case can be distinguished, however, on two grounds. First, the claimant in *Goldblatt* requested only an administrative priority, whereas SF & V has requested immediate payment. Second, and more significant, *Goldblatt* dealt with an implied trust, i.e., the court determined from the course of dealing between Debtor and claimant that Debtor acted as a fiduciary for the claimant. In the case at bar, the terms of the trust are much more explicit. Congress has determined that prompt payment is necessary to assure the viability of the produce industry, and to the extent an administrative priority does not accomplish this goal it is clearly insufficient. It must be remembered that SF & V has creditors of its own that it must satisfy, and that SF & V is very likely as susceptible to imposition of a PACA trust as is Debtor. Even if Debtor proposes to pay a market rate of interest on an installment-based payout, SF & V's cash flow may still be in jeopardy.

Debtor has asserted that the use of the term "floating trust", coupled with language in the legislative history of the PACA trust amendments providing for use by a debtor of trust assets until the beneficiaries are paid, requires that SF & V await the distribution contemplated by Debtor's forthcoming plan of reorganization. It is apparent, however, that the "floating" characteristic of the trust was intended to refer not to time of disbursement but to assets subject to the trust. As regards use by a debtor of trust assets, it is plain that Debtor's construction of this term would rob the trust amendments of their effect and would in fact work to defeat their purpose. The clear language of PACA Sec-

tion 499e and the corresponding legislative history dispel any reasonable doubt as to the Congressional intent involved. The PACA trust was designed to protect unpaid sellers of produce. It is well settled that a statute is to be construed so as to effectuate its purpose. *Environmental Defense Fund v. Tennessee Valley Authority*, 468 F.2d 1164 (6th Cir.1972); *In re Frosty Morn Meats, Inc.*, 7 B.R. 988 (M.D.Tenn. 1980). It is altogether obvious that the PACA trust is intended to remedy the burdens on commerce in produce resulting from a failure of purchasers to pay for the produce received. To require produce sellers, such as SF & V, to wait in line, albeit at the head of the line, would work precisely the sort of interruption of commerce that Congress intended to avoid. In the case at bar, Debtor filed its petition for relief approximately five months ago, and has been selling significant quantities of produce and other inventory on a daily basis, yet SF & V has received nothing from the bankruptcy estate. To date, no plan has been filed, and in informal discussions with the Court and counsel for SF & V Debtor has proposed a year long pay out of SF & V's claim. Assuming no obstacles were met, such as meritorious objections to the plan or disclosure statement, SF & V would be forced to wait almost a year from the date its interest was perfected before receiving a single payment, and will have waited almost two years before its claim is satisfied in full. If SF & V has sufficient cash flow to survive this period, and if Debtor proposes to compensate SF & V for the loss of use of these funds in the interim, the Court would encourage SF & V to accept the proposal, as it would appear to be the least burdensome alternative with respect to Debtor's prospects for reorganization.[5] This Court cannot, however, compel SF & V to accept such a proposal. The Court is of the opinion that SF & V is within its rights in demanding immediate

---

5. Counsel for SF & V have repeatedly assured the Court that they do not seek Debtor's liquidation. The Court urges SF & V to accommodate Debtor to the extent possible to arrive at a mutually agreeable pay out plan that would not preclude Debtor's efforts to successfully reorganize.

payment. *See Matter of Quality Holstein Leasing, supra* at 1012.

## D. *The Tracing Requirement*

█ It is worth mentioning, in the context of Debtor's demand that SF & V specifically trace assets to which the PACA trust applies, that the trust is imbued with an unusual "floating" characteristic, i.e., it applies to *all* of Debtor's produce related inventory and proceeds thereof, regardless of whether SF & V or another produce supplier was the source of such inventory. *See* H.R.Rep. No. 98–543, 98th Cong., 1st Sess. 5 (1983), *reprinted in* 1984 U.S.Code Cong. & Ad.News 409. *See also* 7 C.F.R. 46.46(c) (1984). Congress surely was not blind to the probability that a purchaser of produce would have debts other than those incurred from *these* produce purchases. The legislative history emphasizes that no specific tracing of inventory or proceeds is required (nor, as a practical matter, could such tracing be accomplished). Looking again to the cases construing the PSA trust provisions, which served as the template for the PACA trust, it is clear that the PSA trust beneficiary is not required to carry the burden of tracing; indeed, it is the Debtor who must determine which assets, if any, are *not* subject to the trust. *In re Frost Morn Meats, Inc., supra* at 1013. *See also In re Gotham Provision Company, Inc.,* 669 F.2d 1000, 1011 (5th Cir.1982) ("The only burden on the cash sellers in such a case is to prove the balance due to them and the existence of a floating pool of commingled inventories of livestock products, accounts receivables and proceeds derived from cash and credit livestock sales"). In the case at bar, there was, by the very nature of the business, such a commingling of the produce received by Debtor that it would be virtually impossible for SF & V to specify which inventory was shipped by SF & V, and into which inventory the proceeds of produce shipped by SF & V was invested. Accordingly, this Court will impose no burden of tracing specific assets upon SF & V. Should a dispute arise, it will be the Debt-

or's burden to establish which, if any, assets are not subject to the PACA trust.

## E. *The PACA Trust as a Preference*

Debtor has on several occasions expressed the opinion that the perfections by SF & V of its interest in the PACA trust amounted to a preference subject to avoidance under 11 U.S.C. § 547. As of the date of trial, no adversary proceeding had been commenced by Debtor or any other party in interest to avoid or recover this allegedly preferential transfer. In the interest of finality of judgment, however, this Court will consider the possibility that SF & V's interest in the assets of the PACA trust may be avoidable as a preference.

Bankruptcy Code Section 547, upon which Debtor bases its defense to SF & V's claim, states in pertinent part

(T)he trustee may avoid any transfer of an interest of the debtor in property-

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made-

(A) on or within 90 days before the date of the filing of the petition; ...

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

In the case at bar, SF & V perfected its interest on December 5, 1984, and Debtor filed its petition for relief on February 13, 1985. The 90-day requirement of section 547(b)(4)(A) has therefore been met. SF & V was without question a creditor, and its interest in the trust arose as a result of an antecedent debt owed by Debtor. By virtue of the presumption of section 547(f), Debtor was insolvent at the time SF & V's

interest was perfected. SF & V will undoubtedly receive more as a result of its interest in the PACA trust than it would have received as a general unsecured creditor in a liquidation under chapter 7 of the Code. Some of the elements of a preferential transfer may therefore be present, should Debtor ultimately file an adversary proceeding against SF & V.

■ This is not to say that Debtor has satisfied *all* of the criteria under Section 547(b). It is well established that the Code requires a transfer "of an interest of the debtor in property" before a preference action may be maintained. *See, e.g., Brown v. First National Bank of Little Rock,* 748 F.2d 490, 491 (8th Cir.1984). In the instant case, SF & V delivered produce to Debtor on several occasions prior to December 5, 1984, the date on which the interest was perfected. Close examination of the PACA trust provisions, however, indicates that SF & V's interest arose upon the date of delivery, rather than upon the date of perfection, and was therefore more in the nature of an interest retained by SF & V than an interest transferred by Debtor.

> Perishable agricultural commodities received by a … dealer … and all inventories of food and other products derived from perishable agricultural commodities, and any receivables or proceeds from the sale of such commodities or products, *shall be held by such … dealer … in trust* for the benefit of all unpaid suppliers or sellers of such commodities … until full payment of the sums owing in connection with such transactions have been received by such unpaid suppliers, sellers, or agents.

7 U.S.C. 499e(c)(2) (emphasis added). According to the clear terms of the statute, the inventory and proceeds subsequently derived therefrom was impressed with the trust *upon delivery* to Debtor. Because Debtor never held more than bare legal title to the inventory and proceeds, no transfer of the beneficial interest took place.

This conclusion is reinforced by the terms of the perfection provisions of the PACA trust amendments. "The unpaid supplier, seller, or agent *shall lose the benefits of such trust* unless such person has given written notice of intent to *preserve the benefits of the trust* …" 7 U.S.C. 499e(c)(3) (emphasis added). Congress did not use words indicating that the beneficial interest was *created* upon the giving of notice. Use of the words "shall lose" and "preserve" plainly refer to rights or interests existing *prior to* perfection. The clear meaning of the preservation provisions is that a beneficiary's *pre-existing* beneficial interest would evaporate absent affirmative steps by such a beneficiary to protect such interests. In short, the beneficial interest arises, by operation of law, upon delivery to a dealer of qualifying produce, and said interest exists unless and until either the claim is satisfied or the beneficiary fails to take the necessary steps to perfect.

■ The significance of this determination is made clear upon re-examination of the precise terms of Bankruptcy Code section 547, which defines the characteristics of an avoidable preferential transfer. A threshold issue in any evaluation of the merit of preference claim (or in this case, a defense based upon allegations of a preference) is whether an interest of the debtor in property had been transferred to the creditor. *Brown v. First National Bank, supra; In re Tinnell Traffic Services, Inc.,* 43 B.R. 277, 278 (M.D.Tenn.1984). In the instant case, Debtor never held the beneficial interest in the inventory; indeed, the beneficial interest was held since its inception by SF & V. It is thus apparent that no transfer took place, and therefore that no voidable preference has been established.

The same conclusion was reached, in connection with a state statutory trust, in *In re Casco Electric Corporation,* 28 B.R. 191 (Bkrtcy.E.D.N.Y.1983), *aff'd* 35 B.R. 731 (E.D.N.Y.). The debtor in *Casco* was an electrical contractor working on a number of projects at the time it filed its peti-

tion for relief. As it received payment for work completed, the debtor deposited same in a general checking account, from which it subsequently paid its own bills for supplies, labor, etc. Under New York law, funds received by a contractor were, upon receipt, impressed with a trust for the benefit of subcontractors and suppliers. The funds received by the debtor in *Casco* were therefore held in trust, just as the produce received by Debtor in the case at bar were held in trust.

The trustee in *Casco* filed an adversary proceeding against recipients of payments out of the debtor's general checking account, the same account which contained funds impressed with the state law trust. The recipients defended on the ground that no preferential transfer could be proven, as the money received had never been property of the estate under Code section 541(d). The court agreed, finding that as between the trustee and the recipients, who were beneficiaries under the trust, the latter had superior right to the trust funds during the preference period.

> (T)he burden lies on the trustee to establish every element of a preference, including the fact that the money given it constituted property of the debtor. If the money represented assets of the statutory trust created by New York's Lien Law in (defendant's) favor its receipt by (defendant) was not a preference.

28 B.R. at 195. Of course, in the case at bar SF & V simply took steps, admittedly within the preference period, to perfect and preserve its pre-existing right to payment. Debtor has suggested that certain payments were made during the preference period, an allegation which has not been proven, but to the extent such payments represented assets of the statutory trust impressed by PACA, they were clearly not preferential transfers. Here, as in *Casco*, to order the return of such payments as may have been made, or to negate perfection by SF & V of its pre-existing beneficial interest, would defeat the purpose of the underlying statute, in this case the 1984 PACA trust amendments.

The result most congruent with the legislative intention in enacting the Bankruptcy Code, which was to respect statutory trusts ... and to defer to the public policy behind such laws, is not to apply the preference section of the Code to payments made (to beneficiaries) within the preference period, unless demonstrated *not* to be paid out of monies received from (trust assets).

28 B.R. at 195. *Cf. In re Razorback Ready-Mix Concrete Company*, 45 B.R. 917, 922 (E.D.Ark.1984) (funds paid to IRS from F.I.C.A. withholding were not property of the estate, and therefore no preference was established); *Wickes Boiler Company v. Godfrey-Keeler Company*, 116 F.2d 842, 844 (2d Cir.1940) (Bankruptcy priorities apply only to property of the estate, and not to trust funds of which third parties are the beneficial owners); *Selby v. Ford Motor Company*, 405 F.Supp. 164, 173 (E.D.Mich.1975), *aff'd* 590 F.2d 642, 649 (statutory trust funds are not the property of the debtor and are not subject to the preference provisions of the Bankruptcy Code). Consequently, neither SF & V's actions to perfect and preserve its pre-existing beneficial interest in the PACA trust, nor any payments derived from PACA trust made within the preference period, could be avoided by Debtor under Code section 547(b). For purposes of SF & V's motion, and without prejudice to any actions Debtor may hereafter bring, this Court holds that the preference allegations in Debtor's response will not defeat SF & V's rights to enforce its claim against assets subject to the PACA trust.

*F. Produce in Interstate Commerce*

Debtor has repeatedly asserted, and cited authority from which it purports to infer, that the transactions in question were not in interstate commerce, as that term is defined in PACA, and therefore were not subject to the PACA trust provisions. This Court has not addressed the interstate commerce question in the two previous memoranda, and will hasten to do so now.

According to the evidence presented at the hearing, and the allegations set forth in

the parties' pleadings, SF & V purchased, in the normal course of its business, a variety of perishable agricultural commodities from a number of sources within and without the state of Texas, for ultimate distribution within the city of Dallas. Debtor contends that SF & V purchased such commodities for its own account, brought them to the SF & V warehouses in Dallas, and held them for subsequent sale to various retailers in the Dallas area. Debtor claims that these warehouses were termini, for purposes of ascertaining the extent to which subsequent sales were in the stream of interstate, as opposed to purely intrastate, commerce. Because the produce was in Dallas before Debtor indicated an interest therein, and was shipped from a point in Dallas to another point in Dallas, Debtor finds no justification for describing such trade as "interstate commerce". SF & V, of course, is not inclined to accept this view.

The relevant definition of interstate commerce, by which the PACA trust provisions are triggered, states in pertinent part

A transaction in respect of any perishable agricultural commodity shall be considered in interstate ... commerce if such commodity is part of that current in commerce usual in the trade in that commodity whereby such commodity and/or the products of such commodity are sent from one state with the expectation that they will end their transit, after purchase, in another....

7 U.S.C. 499a(8). Not surprisingly, given the similarity of purpose of the two statutes, the PACA definition of interstate commerce closely tracks the definition set forth in its progenitor, the Packers and Stockyards Act. The latter definition states, in pertinent part

(A) transaction in respect to any article shall be considered in commerce if such article is part of that current in commerce usual in the livestock and meat packing industries, whereby (such commodities) are sent from one State with

the expectation that they will end their transit, after purchase, in another ...

7 U.S.C. 183. As this Court has noted earlier [6], Congress has clearly indicated that precedents established under PSA may be relied upon when construing the provisions of PACA. In *Folsom-Third Street Meat Company v. Freeman*, 307 F.Supp. 222 (N.D.Cal.1969), a number of wholesalers sought to enjoin the Secretary of Agriculture from applying certain record keeping provisions of the PSA. The plaintiffs purchased meat from suppliers within and without the state of California, although it appeared that the majority of such purchases were made from suppliers within the state. Many of the California suppliers had themselves purchased from sources without the state. The court was thus confronted with the issue of whether the plaintiffs were engaged in interstate commerce as defined by the PSA. After briefly tracing the development of the concept of "interstate" commerce, the court concluded that plaintiffs were indeed subject to regulation as participants in interstate commerce as defined in PSA. "(M)uch of the meat purchased by plaintiffs from California sources has in turn come from out-of-state sources, thus affecting commerce and rendering in subject to the Congressional power to regulate interstate commerce." 307 F.Supp. at 226. In the case at bar, Debtor has purchased produce from SF & V, to be shipped from a warehouse in Dallas to Debtor's retail outlets in the same city. The evidence has clearly shown, however, that the majority of said produce had originally come from out-of-state sources. Interstate commerce was therefore affected, and the transactions were properly subject to Congressional regulation. *Cf. Safeway Stores, Inc. v. Freeman*, 369 F.2d 952 (D.C.Cir.1966); *United States v. Tyson's Poultry, Inc.*, 216 F.Supp. 53, 61–2 (W.D.Ark.1963) (PSA covers "not only commercial activities which are a part of interstate commerce but also those activities which are a part of that current of interstate commerce usual in the

---

**6.** *See In re Fresh Approach,* 48 B.R. 926 (Bkrtcy. N.D.Tex.1985).

meat packing and poultry industries"). Under the guidance provided by the PSA cases, then, Debtor was clearly a purchaser in interstate commerce as contemplated by PACA.

This conclusion is entirely consistent with the wealth of case law concerning the scope of Congressional power to regulate activities affecting interstate commerce. For example, in *Park 'N Fly of Texas, Inc. v. City of Houston,* 327 F.Supp. 910 (S.D. Tex.1971), a parking company and a car rental company complained that an ordinance of the city of Houston, which restricted the use and availability of shuttle buses at Houston's Intercontinental Airport, placed them at a competitive disadvantage because the shuttles owned and operated by the city were not similarly restricted. The plaintiffs argued that the ordinance effectively imposed an undue burden on interstate commerce.

In response, the city asserted that the ordinance could not possibly burden interstate commerce, as the plaintiffs were engaged in activities wholly confined to the city limits. The court, however, noted that "(i)nterstate commerce is an intensely practical concept, and the characterization of one portion of a journey must be made by viewing the logical relation of that portion of the entire journey." 327 F.Supp. at 920. Although a particular activity might, by itself, be conducted entirely within the borders of a single state, its effect or dependence upon activities taking place in other states could very well bring it within the scope of interstate commerce.

> (T)he practical concept of interstate commerce may necessarily at times include travel occurring wholly within one state. . . . (i)t is easily discernible that the beginning and end of interstate commerce are not drawn by arbitrary lines, but by practical effect.

327 F.Supp. at 920–21. Citing *United States v. Yellow Cab Company,* 332 U.S. 218, 228, 67 S.Ct. 1560, 1566, 91 L.Ed. 2010 (1947), the court acknowledged that

> (w)hen persons or goods move from a point of origin in one state to a point of

destination in another, the fact that a part of that journey consists of an independent agency solely within the boundaries of one state does not make that portion of the trip any less interstate in character.

*Id.* In the case at bar, Debtor was one of the intermediaries in the stream of commerce flowing from the producers in various states to the consumers in Dallas, Texas. While it is true that a segment of that stream was wholly within the state of Texas, i.e., from SF & V to Debtor, it cannot reasonably be denied that all parties contemplated a transaction having the practical effect of providing access for Texas consumers to produce grown in other states. Had the purchases by Debtor been an unusual occurrence, not previously contemplated by SF & V or the producers, Debtor might have a stronger argument. Here, however, Debtor knew the source of its produce; indeed, it can be fairly inferred that Debtor intended to acquire its inventory from those sources. In addition, Debtor has not addressed the question of whether its own customers are strictly Texans, or whether some of its clientele may in fact be from other states. Debtor is not the ultimate consumer of the items at issue here, and may itself be a mere conduit for the flow of goods through interstate commerce. In any case, it is well established that the power of Congress to regulate reaches the activities of handlers of goods even after they come to rest within a particular state. *See, e.g., Futrell v. Columbia Club, Inc.,* 338 F.Supp. 566, 569 (S.D. Ind.1971).

As the evidence pointedly shows, however, this Court need not invoke the general principles of the scope of permissible Congressional regulation to support the conclusion that the transactions at issue were in interstate commerce. Mr. Morris Rutchik, the vice president of SF & V, testified at the hearing and via affidavit that the produce delivered to Debtor was obtained from out of state sources, and that the transactions involved were typical, not only in the industry, but the course of

dealing between Debtor and SF & V. Mr. Rutchik's testimony is bolstered by the finding of a representative of the Department of Agriculture that a majority of the produce purchased by Debtor in the transactions at issue was in the stream of interstate commerce. Moreover, in correspondence filed with this Court, the Department has made clear its satisfaction that sufficient produce was purchased from vendors without the state of Texas to justify application of the PACA licensing provisions. In fact, Debtor has itself implicitly acknowledged that, in the ordinary course of business, it is a participant in the interstate produce market, as made clear by Debtor's previous PACA license and pending license application. Taken together, the circumstances virtually compel a finding that this transaction was "part of that current in commerce usual in the trade ... whereby such commodity and/or the products of such commodity are sent from one state with the expectation that they will end their transit, after purchase, in another." 7 U.S.C. 499a(8).

It remains to be determined, however, whether SF & V's contention that all $106,000 worth of produce delivered to Debtor was furnished by out of state producers is accurate. Debtor, of course, will not concede that any of the produce was shipped into Texas.[7] The Department of Agriculture has expressed sufficient doubt as to the figure claimed by SF & V to lower its own estimate to $97,934.75.[8] Mr. Rutchik testified at the June 6 hearing that, in his opinion, the entire amount claimed represented qualifying produce shipped across state lines. On cross examination, however, it became somewhat confusing as to whether Mr. Rutchik included in his claim items such as peanuts, bags, rubber bands, and other items which clearly do not come within the penumbra of PACA. This Court has reviewed the affidavit executed by Mr.

Rutchik, and has taken judicial notice of the accounting prepared by the Department of Agriculture and filed as an exhibit in a related proceeding concerning Debtor.[9] This Court is of the opinion that SF & V has not established its entitlement to the full amount claimed. As Debtor has noted, SF & V has been unable to establish with the requisite certainty that all of the produce delivered, and asserted to be subject to the trust, originated beyond the borders of Texas. Indeed, as noted above, Debtor denies even receiving approximately $20,000 of the produce on which SF & V bases its claim. It is true that Mr. Rutchik could not positively confirm that Debtor had received this portion of the produce, and that the corresponding invoices did not bear the signature of an agent of the Debtor acknowledging receipt. On the other hand, the Department of Agriculture has indicated that this produce was received, though the basis for this conclusion is unclear. Furthermore, Debtor has listed in its schedules an obligation owed to SF & V in the amount of $115,000, which this Court construes as an admission that at least some produce was received. There is no indication, however, as to whether the produce for which Debtor acknowledges an obligation was received before or after SF & V perfected its notice, or whether the entire amount acknowledged was even subject to the trust. Debtor apparently does not dispute that it received the remainder of the produce upon which SF & V bases its claim. Consequently, this Court is faced with the dilemma of three figures. SF & V claims, but has not proven, entitlement to $106,000. The Department of Agriculture has, by its own reckoning, determined that this sum should be reduced to $97,934.75. Debtor claims that either sum should be reduced by at least $20,625.75. This Court notes the considerable

7. To no one's surprise, and to his credit, counsel for Debtor has fought SF & V in every way imaginable, and has even asserted that Debtor never received the produce at issue.

8. Letter from Dennis Becker, Deputy Assistant General Counsel, United States Department of Agriculture, to Court (April 1, 1985) (discussing applicability of PACA and amount of eligible claim).

9. *See Fresh Approach, Inc. v. United States,* 49 B.R. 494 (Bkrtcy.N.D.Tex.1985).

**428**

volume of business transacted between Debtor and SF & V over a significant period of time, as well as the absence of any protest by Debtor, prior to this hearing, that the produce on the unsigned invoices had not been received. It is more than reasonable to assume that sometime between the end of November, when the invoices were originally submitted to Debtor for payment, and the beginning of June, when Debtor first raised this objection, it would have become apparent that Debtor had been billed for produce it had not received. The Court infers from the absence of any objection during this period that Debtor did not dispute receipt of that produce, and that the present objection is but another effort by counsel for Debtor to forestall the inevitable payment of SF & V's claim. SF & V's assertions may, perhaps, have been bolstered by corroborating testimony of the employee charged with delivery of the produce, or by production of loading manifests or other documentation establishing delivery, but this Court is convinced that the absence of signatures on the invoices in question is not dispositive, and more likely represents oversight or haste on the part of the employees involved, rather than a failure by SF & V to deliver the produce for which Debtor was billed. After careful consideration of the parties' pleadings, the affidavits, and the testimony of Messrs. Rutchik and Loper, this Court concludes that SF & V has failed to establish entitlement to $8,228.89 (not subject to PACA) but that the remaining produce was delivered to and received by Debtor. This Court will therefore deduct the amount of $8,228.89 from the original claim of $106,163.64, and will allow as subject to the PACA trust the produce related inventory and proceeds thereof in the amount of $97,934.75.