### In re BEHRING INTERNATIONAL, INC., Debtor.

### NEOCHEM CORPORATION, Plaintiff,

v.

### BEHRING INTERNATIONAL, INC. and Don Navarro, Trustee, Defendants.

Bankruptcy No. 385–31034 M–7.

Adv. No. 385–3902.

United States Bankruptcy Court, N.D. Texas, Dallas Division.

June 11, 1986.

Allan R. Lazor, Houston, Tex., for plaintiff.

Tim Vineyard, Dallas, Tex., for Navarro.

## MEMORANDUM OPINION

ROBERT C. McGUIRE, Chief Judge.

Pursuant to Bankruptcy Rule 7052, the following constitutes the Court's findings of fact and conclusions of law with respect to the trial held March 3, 1986.

## FINDINGS OF FACT

Behring International, Inc. ("Behring" or "Debtor") commenced this case in this court on April 17, 1985, by the filing of a voluntary petition pursuant to Chapter 11, Title 11 of the United States Code. The Court converted the case to a Chapter 7 on August 5, 1985, and Don Navarro ("Navarro" or "Trustee") was appointed Trustee. Navarro is a resident of the Northern District of Texas and has been serving as a Chapter 7 trustee in this case since his appointment. Behring is a Texas corporation, with a place of business in the Northern District of Texas, Dallas Division. Neochem Corporation ("Neochem") is a Texas corporation with its principal place of business in Houston, Texas. Neochem is in the specialty chemical business and buys chemicals from foreign sources to sell in the United States.

Prior to the filing of the voluntary petition on April 17, 1985, Behring did business as a "customs broker" within the meaning of 19 U.S.C. § 1641(a)(1) in transactions involving the entry and admissibility of merchandise, its classification and valuation, and the payment of duties or other charges assessed or collected by the United States Customs Service upon merchandise imported into this country. Behring made entry and paid required customs duties on behalf of numerous customers in connection with imported shipments other than the shipment which is the subject of this adversary proceeding. Neochem was one of Behring's customers prior to the filing of the bankruptcy petition and had engaged Behring's services for several years prior to the shipment in question. The course of dealing between Behring and Neochem entailed Neochem placing orders relating to particular shipments with Behring, who would undertake to make entry and pay customs duties with respect to such shipments. Behring would then send its invoice for that particular order to Neochem; the invoice included the fee for Behring's services and an estimate of the

customs duties owing on that particular shipment. Neochem would then remit payment for Behring's services and estimated customs duties to Behring. Upon receipt of the payment, Behring would make entry and pay the applicable duties to the United States Customs Service upon merchandise for which Neochem was the importer of record. As part of this course of dealing, Behring, through its officers, agents or employees, from time to time signed consumption entry forms in the capacity of attorney and/or attorney-in-fact for Neochem. *See,* Debtor's Ex. 3 (dated September 20, 1982); *see, generally,* 19 C.F.R. § 141.46. Prior to the instant case, Behring had never failed to pay the customs duties when employed by Neochem.

Prior to March, 1985, Neochem employed Behring as Neochem's customs broker to obtain customs clearance and pay United States customs duties in connection with the importation of a chemical substance known as di isobutylene. Behring, through its agents, accepted employment as Neochem's customs broker in connection with the above-described shipment, and, accordingly, agreed to make entry and pay required customs duties for the imported shipment of di isobutylene. Per Plaintiff's Ex. 1, Behring did invoice and receive from Neochem an advance of funds for payment of customs duties in the amount of $18,-687.15. Neochem sent its check No. 5871 (the "Check") (See Plaintiff's Ex. 4), dated April 10, 1985, in the amount of $18,797.15 to Behring, which Check included $110 for Behring's service fee and $18,687.15 for customs duties. On April 17, 1985 (the date of its filing Chapter 11), Behring received, and, on April 18, 1985, deposited the Check in its lock box account no. 7200961, styled "Depository Account" (the "Account"), at the Standard Chartered Bank in Houston, Texas ("Bank"). Neochem had sufficient funds on deposit to pay the Check at the time the Check was presented, and, indeed, the Check was honored upon presentment. Although the transaction took place in New York, New York, the receipt and depositing of the Check occurred in Houston, Texas.

All the payments made by Neochem and customers like Neochem, were deposited by Behring to the Account, which was under the sole control of the Bank. All monies deposited to the Account were withdrawn by the Bank and used to reduce Behring's indebtedness to the Bank. Behring has never drawn any money from the Account or written any checks on the Account. No part of the proceeds of the Check, or any other funds deposited in the Account, was ever used by Behring to acquire any assets, or commingled in any way with any other funds or accounts of Behring, except to the extent that they were commingled in the Account.

Neochem did not restrict, in any way, Behring's use of the funds paid by the Check. Neochem did not require, for instance, that Behring hold, deposit or disburse the funds in any particular fashion. Behring was not required to segregate the Neochem funds represented by the Check, nor did Behring ever represent that those exact funds would be used for any particular purpose. At the time of the transaction in dispute, Neochem did not restrict, in any way, the source of funds from which Behring was to pay Neochem's customs duties. In fact, Behring's practice involved sending an invoice to the customer, and, upon receipt of the customer's payment, depositing the payment into the Account. Depending on the amount in the Account, Behring drew down its normal operating expenses (including funds to pay customs duties) from an operating account in New York with the same bank pursuant to a financing arrangement. No written contract was ever entered into by Behring and Neochem with regard to the transaction in dispute.

At the time Behring was engaged by Neochem to arrange for entry of the shipment of its goods constituting the subject of the instant dispute, Behring intended to perform the agreed upon services.

Behring's depositing employees knew that such funds were being commingled with the Debtor's other funds when they deposited the Check. On April 17, 1985,

the date of the filing of the bankruptcy petition, Behring's Houston office was virtually shut down, and no officer, director, or employee of Behring knew how long it would be operating on a reduced basis. There was no evidence that, at the date of the filing of the petition, Behring's directors, or shareholders, had directed it to permanently cease all business. There was no showing that, on the date of Behring's filing of the bankruptcy petition, there were any state or federal regulations mandating that Behring discontinue operations, nor has there ever been a showing that Behring's actions with regard to Neochem ever rose to the level of fraud, bad faith, or collusion.

Behring failed to pay the applicable customs duties with the funds received from Neochem, which had been advanced by Neochem for the payment of all customs duties and fees. The United States Customs Service sent to Neochem a Notice of Penalty or Liquidated Damages Incurred and Demand for Payment ("Notice") as a result of Behring's failure to pay the customs duties. (Plaintiff's Ex. 5, dated June 26, 1985, is a true and correct copy of said Notice). As a result of the Notice, Neochem had to pay the United States Customs Service the same $18,687.15 customs duty on August 5, 1985. (See Plaintiff's Ex. 7). Pursuant to 19 C.F.R. § 111.29(a) (1985), Behring, as a customs broker, upon receipt of funds from Neochem for payment of

duty, tax, or other debt or obligation owing to the government, was required to pay the United States Customs Service within thirty days from the date of the receipt or the date due, whichever was later. The regulation did not require any segregation of funds, nor did it impress a trust on the customs broker's assets for the customs duties.

Cash on hand in the Debtor's estate at the time of the commencement of the bankruptcy case exceeded the amount of $18,797.15. Cash on hand in the Debtor's estate exceeds the amount of $100,000. (From Defendants' Proposed Stipulated Facts 19 and 21).

## CONCLUSIONS OF LAW

 Neochem argues that it retains equitable title to the property by virtue of 19 C.F.R. § 111.29, which provides that the broker shall exercise due diligence in the payment of funds to the United States Customs Service.[1] Failure to exercise this diligence, in light of the statute, evidences the breach of fiduciary duty necessary, according to Neochem, to impose a constructive trust. In determining whether the money paid by Neochem to Behring should constitute part of the Debtor's estate, the inquiry must focus on whether the money should be considered subject to a constructive trust, and, hence, outside the Debtor's estate.[2] The short answer is that the money is not subject to a constructive trust.[3]

---

1. 19 C.F.R. § 111.29 (1985) provides

 (a) *Due diligence by broker.* Each broker shall exercise due diligence in making financial settlements, in answering correspondence, and in preparing or assisting in the preparation and filing of documents relating to any matter handled by him as a broker. Funds received by a broker from a client for payment of duty, tax, or other debt or obligation owing to the Government shall be paid to the Government within 30 days from date of receipt or date due, whichever is later. Each broker shall within 60 days account to clients for funds received for them from the Government, or received from a client in excess of the governmental or other charges properly payable in response to the client's business. He shall account to all other persons within 30 days of receipt for all funds advanced by a client for payment of any charges, debts, or obligations due such other persons.

 (b) *Notice to client of method of payment.* (1) All brokers shall provide their clients with a written notification as follows:

 If you are the importer of record, payment to the broker will not relieve you of liability for Customs charges (duties, taxes, or other debts owed Customs) in the event the charges are not paid by the broker. Therefore, if you pay by check, Customs charges may be paid with a separate check payable to the 'U.S. Customs Service' which shall be delivered to Customs by the broker.
 *See, also,* 19 C.F.R. § 141.1(b)(3)(ii) (1985); *see, generally,* Appendix 1.

2. For general discussion, *see, Georgia Pacific v. Sigma,* 712 F.2d 962 (5th Cir.1983); *In re Quality Holstein,* 752 F.2d 1009 (5th Cir.1985).

3. The discussion will focus on whether the court should impose a constructive trust on the debt-

An express trust was not created by the pertinent documents, and an express trust is not provided in the governing regulation. Hence, a trust will arise, if at all, through a court-imposed constructive trust. The controlling case appears to be *In re Black & Geddes, Inc.*, 35 B.R. 827 (Bankr.S.D.N.Y. 1983). In *Black & Geddes, supra*, the court examined the issue of imposing a constructive trust on a freight forwarder who had previously failed to pay shipping charges to the carrier despite the freight shipper's payment to the freight forwarder for these shipping charges. Judge Abram examined the governing statute in that opinion and concluded that 46 C.F.R. § 510.23(f) governed the freight forwarder's relationship with its shippers. That statute required that the freight forwarder pay over to the carrier any monies received from a customer which are designated for freight charges within five days after the ship leaves port or seven days after receipt of the funds. Moreover, expert testimony at the trial showed that the relationship between the shipper and its customer was a fiduciary relationship. Nonetheless, the Federal regulations did not require the freight forwarder to separate the monies received from the shipper even though those funds had been intended by all parties as payment to the carrier. Accordingly, no claim could have been asserted by the creditor that an express trust had been created by statute. *Black & Geddes, supra*, at 835–36. Judge Abram concluded from the statute and testimony that, absent a requirement that the freight forwarder segregate the monies received from the shipper, no constructive trust could be imposed. Because nothing prevented the freight forwarder from commingling funds,

the failure on the part of the freight forwarder (even if a fiduciary) to pay the carrier with the shipper's funds created a debtor-creditor relationship between the freight forwarder and the shipper, and not a constructive trust. *Black & Geddes, supra*, at 836–38.

Likewise, in the instant case, although the regulation requires due diligence in payment on the part of the customs broker, and provides that the payment be made to the United States Customs within thirty days of the day of receipt, the statute *does not provide* for segregation of the funds. According to the ruling in *Black & Geddes, supra*, this court should not impose a constructive trust based on 19 C.F.R. § 111.29 or 19 C.F.R. § 141.1(b)(3)(ii)(A) because the Debtor did not breach any statutory requirement to segregate the funds of customers. Hence, no wrongdoing occurred which would give rise to impression of a constructive trust. The previous dealings between the parties show that neither contemplated that Neochem's check would be segregated into a separate account.

An often-cited case by numerous Bankruptcy Courts for their discussion of constructive trust is *In re Penn-Dixie Steel Corp.*, 6 B.R. 817 (Bankr.S.D.N.Y.1980). The *Penn-Dixie Steel* court attempted to set out a standard to judge whether the facts warranted imposition of a constructive trust.

> At times, whether a debt or trust arose may not be too clear. In these cases the intention of the parties must be sought and is determinative. If the formative language, written or oral, provides no clue, resort to circumstances surrounding the transaction in question must be

---

or's account. Neither side has raised the issue of whether a resulting trust applies, and, accordingly, there will not be any in-depth consideration of that issue. As noted in 89 C.J.S. § 14:

> Resulting and constructive trusts, while frequently confused, are clearly distinguishable. A resulting trust is a status that automatically arises by operation of law out of certain circumstances, while a constructive trust is a remedy that equity applies in order to prevent

injustice or in order to do justice. In the case of a resulting trust there is always the element, although it is an implied one, of an intention to create a trust, by reason of which, although it is by no means an express trust, it approaches more nearly thereto....

C.J.S. § 14. A resulting trust does not appear to be the appropriate remedy in light of the evidence in the record.

had. In general, when *the circumstances are such that the recipient of the funds is entitled to use them as his own and can commingle them with his own moneys, a debtor-creditor relationship exists, not a trust.*

*In re Penn-Dixie Steel Corp., supra*, at 823–24. [emphasis added]

The facts in *Penn-Dixie, supra*, involved a shipper who utilized a carrier to transport its steel to customers. Apparently, the arrangement involved direct billing of the shipper-debtor, who would pay the carrier out of its general funds. All shipping costs were included in the bill to customers, and when they paid the debtor, the debtor deposited the money in its general account and used that money to pay the carrier. Hence, the carrier asserted that it had an equitable claim to the funds in the general account because those funds were, at least partially, the result of the payment of shipping charges. The Bankruptcy Court refused to impress a constructive trust and held instead that the carrier possessed a general unsecured claim. The *Penn-Dixie* court found no fraud or inequitable conduct on the part of the debtor, and further noted that the failure to pay a debt is insufficient to give rise to a constructive trust because the relationship between the parties is merely that of debtor and creditor.

The District Court affirmed the decision of the Bankruptcy Court in *In re Penn-Dixie Steel Corp.*, 10 B.R. 878 (S.D.N.Y. 1981).

Similarly, the evidence in the record showed that neither the course of dealings between the parties, nor the statute, required a separation of funds by Behring. Further, no fraud or inequitable conduct on Behring's part was shown at the hearing. Hence, the relationship of Neochem and Behring resembles most closely one of creditor and debtor.

The Fifth Circuit in *In re Kennedy and Cohen*, 612 F.2d 963 (5th Cir.1980) discussed the imposition of a constructive trust in bankruptcy cases. *In Kennedy and Cohen, supra*, former customers of the debtor, a housing and appliance dealer located in multiple states, sued for return of their unused funds which had been paid by the customers on the debtor's maintenance contracts. The customers sought to impose a constructive trust on the debtor's assets and moved for summary judgment. The trustee likewise moved for summary judgment against the customers. The Bankruptcy Court granted the trustee's motion for summary judgment and denied the customers' motion for summary judgment. Both the District Court and the Fifth Circuit affirmed this result.

In its rather terse discussion, the Fifth Circuit quoted the Bankruptcy Court's decision in part. The Bankruptcy Court had earlier concluded that the movants had failed to trace the *res* successfully. The movants argued that the funds had been commingled, violating the debtor's fiduciary duties to them. The Bankruptcy Court stated "I reject the argument that the sale of maintenance contracts, without more, creates a legal duty to segregate the funds received for that purpose and imposes a constructive trust upon them. ... The *record before me negatives any allegation that the bankrupt knew before bankruptcy that it could not perform these contracts, therefore, sold them fraudulently.* The record negatives any other suggestion of actual or constructive fraud ..." *Kennedy & Cohen, supra*, at 965 [emphasis supplied] The Bankruptcy Court recognized that state law is subordinate to Federal bankruptcy law when the state law rearranges the absolute priority rule by impressing a trust on general funds of the debtor in favor of particular creditors. *Kennedy & Cohen, supra*, at 965–966. The Bankruptcy Court, cited in the Appendix, also noted that "it is a federal question, whether a trust, whether express or constructive, which cannot be traced to specific assets, will attach to the creditor's general funds *in bankruptcy*". *Id.* at 965. The District Court order, which was also contained as part of the Appendix, stated that, under federal law, the plaintiffs must be able to trace their funds to an identifiable trust in the hands of the trustee. Inso-

far as state law is to the contrary, it must yield to federal policy. *Id.,* at 966–967.

■ The party asserting a constructive trust must show not only a wrongdoing, such as actual fraud or breach of fiduciary duty, but must show an identifiable *res* to which they can point to as the property to which their constructive trust attaches. *See, e.g., Rosenberg v. Collins,* 624 F.2d 659, 663 (5th Cir.1980); *In re Morales Travel Agency,* 667 F.2d 1069, 1071 (1st Cir.1981); *In re U.S.N. Co., Inc.,* 32 B.R. 675, 678 (Bankr.S.D.N.Y.1983); *In re Ind. Land Title Corp. of Ill.,* 18 B.R. 673, 674 (Bankr.N.D.Ill.1982). No such showing was made in the instant case.

■ The reluctance of Bankruptcy Courts to impose constructive trusts without a substantial reason to do so stems from the recognition that each unsecured creditor desires to have his particular claim elevated above the others. Imposition of a constructive trust clearly thwarts the policy of ratable distribution and should not be impressed cavalierly. Judge Rubin recently discussed the role of § 105 of the Bankruptcy Code in Bankruptcy Court decisions and noted:

> While the bankruptcy courts have fashioned relief under Section 105(a) in a variety of situations, the powers granted by that statute may be exercised only in a manner consistent with the provisions of the Bankruptcy Code. That statute does not authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity.

*United States v. Sutton,* 786 F.2d 1305, 1308 (5th Cir.1986). Impressing a constructive trust should be done only after a showing that a wrongdoing of some sort or a breach of fiduciary duty occurred and a tracing by the claimant to a specific *res.*

Neochem cited *In re Fresh Approach,* 51 B.R. 412 (Bankr.N.D.Tex.1985) as support for its position that a constructive trust may be imposed on the Debtor without requiring a tracing. The *Fresh Approach* decision provided that the movant seeking to impose the trust under the PACA statutes did not have to trace the *res. Fresh Approach, supra,* at 422. Nonetheless, the *Fresh Approach* court explained that the "legislative history emphasizes that *no specific tracing of inventory or proceeds is required". Fresh Approach, supra,* at 422 [emphasis added]. Because the basis for the imposition of a trust was statutory in *In re Fresh Approach, supra,* which not only imposed an express trust on the debtor's assets, but provided that the trust attach to all assets when commingling occurred, Neochem's reliance on it is misplaced. *Fresh Approach* is easily harmonized with the decision in *Black & Geddes, supra,* insofar as the former decision contains a statute creating an express trust while the latter refuses to impose a constructive trust absent a statutory requirement of either an express trust or express segregation of the funds. Accordingly, *Black & Geddes, supra,* controls the instant case.

The argument for imposing a constructive trust should be fully examined, however, and the starting point should be 11 U.S.C. § 541(d)[4] which provides in pertinent part:

> Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest,.... becomes property of the estate ... only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

The Fifth Circuit in *Quality Holstein, supra,* concluded that § 541(d) overcomes the trustee's powers under § 544 where the

---

**4.** The plaintiff has focused on § 541(d) and has cited *Quality Holstein, supra,* as support for its position that if debtor has only legal title to property, then the plaintiff may come in and reclaim its equitable interest in the property through the bankruptcy proceeding. Neither side focused on § 541(a) which provides that the commencement of a case creates an estate including all legal or equitable interests of the debtor, and accordingly, the discussion will be limited to § 541(d).

applicable State law provides a constructive trust on the property, thereby removing any claim of equitable title from the property of the estate. *Quality Holstein, supra,* at 1012–14. The underlying legislative history of § 541 provides that it shall apply to:

> Situations [which] occasionally arise where property ostensibly belonging to the debtor will actually not be property of the debtor, but will be held in trust for another. For example, if the debtor has incurred medical bills that were covered by insurance, and the insurance company had sent the payment of the bills to the debtor before the debtor had paid the bill for which the payment was reimbursement, the payment would actually be held in a constructive trust for the person to whom the bill was owed. This section [§ 541] ... also will not affect various statutory provisions that give a creditor of the debtor a lien that is valid outside as well as inside bankruptcy, or that creates a trust fund for the benefit of a creditor of the debtor. *See* Packers and Stockyards Act § 206, 7 U.S.C. 196.

H.R.Rep. No. 95–595, 95th Cong. 1st Sess. (1977) 368, *reprinted in* 1978 U.S. Code Cong. & Admin. News 5787, 6324.

The legislative history appears to contemplate imposition of constructive trusts in two circumstances, to wit, where the debtor possesses the property, or has legal title, but does not have equitable claim or title to that property, and where a statutory trust exists. Because neither the governing regulations, nor the case law discussing imposition of constructive trusts based on a Federal statute or regulation, supports imposing a constructive trust in the instant situation, the only basis for impressing a constructive trust appears to be the first situation contemplated in the legislative history, the insurance company hypothetical, in which a debtor receives money for payment to another party.

The Ninth Circuit, in *In re North American Coin & Currency, Ltd.,* 767 F.2d 1573 (9th Cir.1985), discussed imposition of a constructive trust when the debtor fails to disclose his insolvency despite seeking and receiving monies from customers. The Ninth Circuit discussed whether this would constitute fraud on the debtor's part and concluded:

> In Arizona, as elsewhere, 'actual fraud' is characterized by a willful intent to deceive *Smith v. Pinner,* 68 Ariz. 115, 201 P.2d 741 (1949). The debtor commits fraud, even though he has made no affirmative false representations, if he commits himself to a transaction with no intention of carrying it out. An intention not to carry out the transaction—in other words, a fraudulent intent—may be inferred where the debtor conceals his insolvency knowing that his financial situation is so hopeless that he can never meet the obligation he has acquired. However, the debtor's mere failure to disclose his insolvency, without more, does not constitute a fraud entitling the creditor to rescind the transaction. If the debtor believes in good faith that he will be able to carry out the transaction, he lacks the deceptive intent necessary for a finding of fraud.

*In re North American Coin & Currency, Ltd., supra,* at 1576. (citations omitted).

The *North American Coin* court points out that bankruptcy policy, particularly that of ratable distribution, might well override State law that imposes a constructive trust on commingled property. *North American Coin, supra,* at 1575–76. The *North American Coin* court ruled that no intent to deceive could be discerned from the facts in evidence. *Id.* at 1576. Further, the Court found that the debtor honestly believed it could complete the transactions for which it received customer funds. *Id.* at 1576–77. The facts involved officers of the debtor placing customer funds in an escrow account because the company was having cash flow problems. The debtor's officers expected a cash infusion from shareholders within a few days of establishing the escrow account. The shareholders' contribution did not occur as expected. Hence, the company filed for bankruptcy. The *North American Coin* court distin-

guished its facts from two cases, which were also cited by Neochem, *In re Bengal Trading Corp.*, 12 B.R. 695 (Bankr.S.D.Fla. 1981); *In re Vermont Real Estate Investment Trust*, 25 B.R. 813 (Bankr.D.Va. 1982). Both cases involved circumstances in which the debtor was either unable or clearly knew that it could not complete the requested transactions when it received and deposited the customer's funds. *North American Coin, supra*, at 1577. The *North American Coin* court concluded that the facts did not show that the debtor acted in bad faith, committed fraud, or, in any way, knew or believed that it could not complete the transactions in question. A preponderance of the evidence in this case does not show that Behring acted in bad faith, committed fraud, or that the Debtor had no basis for its belief that it could complete the transaction in question.

*In re Bengal Trading Corp., supra* involved a commodities futures commission merchant who accepted funds for a securities purchase at a time when he could not legally trade in commodities futures because he did not meet the federal minimum financial requirements. The Bankruptcy Court concluded that the debtor, although possessing the customer's funds, held those funds in trust for the customer. The trustee in *Bengal Trading* had taken the position that the funds received from a customer and deposited in the debtor's account constituted property of the estate. The *Bengal Trading* court ruled that:

> This court would agree with the trustee if Bengal had been in a position to do business at the time Koci's funds were received. *However, it was precluded by law from accepting and handling his money at the time it was transferred.*

*In re Bengal Trading Corp., supra*, at 696. (Emphasis added).

The *Bengal Trading* court concluded that the funds sent to the debtor were analogous to an accidental crediting by the bank to the debtor's account of funds which otherwise did not belong to the debtor.

*In re Vermont Real Estate, supra*, involved a receipt of funds by the trust prior to freezing its operations, but the funds were deposited after the trustees of the trust voted to cease all operations. The *Vermont Real Estate* court held that:

> ... when Dr. Sommer's [the customer's] monies were truly obtained the Trust had suspended its securities transactions. Because of this suspension, the Trust was unable to deal with Dr. Sommer's purchase order and, correspondingly, should not have dealt with his remittances. As such, the funds provided by the Plaintiff should be subject to a constructive trust held by the Debtor for the benefit of Dr. Sommer.

*In re Vermont Real Estate, supra*, at 816.

Although the trust apparently was not under a statutory obligation to halt operations, its trustee's explicit orders made it clear that the customer's funds were deposited at a time when it was impossible for the debtor to do business.

In both *In re Vermont Real Estate Inv. Trust, supra*, and *In re Bengal Trading Corp., supra*, the debtors received a check from a customer after they had already ceased doing business. There was neither a statutory obligation nor explicit direction of the debtor's officers to halt all operations prior to the depositing of the Neochem check. Neochem did not show that Behring's employees assumed that business operations would be shut down indefinitely. Rather, the evidence showed that Behring's employees believed that they could continue business operations, and, thus, did not knowingly act in a manner which would rise to the level of bad faith. Hence, receipt of funds for payment to a third party does not necessarily constitute *per se* bad faith.

The District Court in *Yonkers Bd. of Education v. Richmond Children's Center*, 58 B.R. 980 (S.D.N.Y.1986) (*"Yonkers"*) recently reversed Judge Schwartzberg's opinion in *In re Richmond Children's Center*, 49 B.R. 262 (S.D.N.Y.1985) (*"Richmond"*) (Bankruptcy Judge Schwartzberg sitting as a District Court

Judge). The facts in this case were undisputed. The debtor was a private child care facility in New York equipped to care for mentally retarded youths. Pursuant to New York law, those child care centers, such as the debtor, which did not provide educational facilities for the developmentally handicapped, were required to contract with the local Board of Education in the community in which the child care facility was located for educational services for the youngsters residing in the child care center. The State Board of Education would then send to the child care center funds to reimburse the school district providing the educational services. The purpose of this system was to insure that the mentally retarded received free public education, but, at the same time, to relieve communities in which a particular child care center was located from bearing the cost of educating numerous children whose parents were not residents of the school district. The funds paid to the debtor were deposited in its general account and commingled with various other payments to the debtor by other government agencies. A transmittal letter was included with the check sent by the New York State Board of Education characterizing the funds represented by the check as "pass through" funds designated for payment by the debtor to the local school board. No explicit requirement for segregation of the funds existed, nor did the contract expressly require any segregation. The debtor used the funds in question for care and upkeep of the children and could not pay the Yonkers Board of Education. The debtor then filed Chapter 11.

The issue was whether the Yonkers Board of Education could properly assert a constructive trust on the remaining funds of the debtor. Judge Schwartzberg, in *Richmond, supra,* rejected the plaintiff's arguments that the State Board of Education's transmittal letter and a provision in the contract to the effect that payments to the local school board were reimbursable by the State Board of Education supported impressing a constructive trust. Nor did the requirement that the debtor provide

education for the children in its care give rise to a constructive trust, according to the *Richmond* court. The court noted that "[a]bsent a separate trust *res,* the mere breach of a contractual obligation concerning the payment of a debt does not constitute a basis for imposition of a trust." *Id.,* at 268.

The *Yonkers* court viewed the facts in a different light, finding that the debtor was merely a conduit for the payments for the State Board of Education to the Yonkers Board of Education. This finding was based on the *Yonkers* court's view of the context of the relationships between the parties, seen against the background fact that the State of New York was making one hundred percent of the reimbursement payments from public funds. Thus, the *Yonkers* court reasoned that there was no statutory authorization for the commingling of those funds with the debtor's other operational funds. The *Yonkers* court attached much significance to the fact that the transmittal letter from the State Board of Education characterized the funds as "pass through" funds and the fact that the money in dispute was intended for the benefit of education of the children who were cared for by the debtor, and not for the benefit of the debtor. Apparently the exigencies of the situation influenced the *Yonkers* court which expressed its concern in the opinion that the children "[b]y attending this care facility ... not lose their right to a free public education." *Yonkers, supra,* at 982.

The District Court's reversal of Judge Schwartzberg's decision does not appear to be persuasive or controlling insofar as this case is concerned.

Based on the construction given the statute and the attendant circumstances by the *Yonkers* court, the debtor in that case was required to segregate the monies sent to it by the New York State Board of Education. No such requirement has been shown in the instant case, either from the parties' prior course of dealing, or from the

statute. The statute provides a minimum thirty-day period in which the broker has to make payments, which certainly does not impose a requirement to segregate or "pass through" the funds. The *Yonkers* court relied on the public policy of providing free education to the developmentally disabled to elevate the Yonkers Board of Education over other unsecured creditors. Undergirding the *Yonkers* decision is a subtle shifting of the burden of proof from the party asserting the constructive trust to the debtor, and this is best seen in the court's statement that "there is no statutory authorization for any commingling of these funds with Richmond's own operational funds." *Id.* at 983. As noted in *Black & Geddes, supra,* the party asserting the constructive trust must show that segregation was required. The burden of proof in the Fifth Circuit clearly rests on the proponent of the constructive trust. *See, e.g., Rosenberg, supra,* at 663–664. It should also be noted that in *Yonkers* the District Court remanded the case to the Bankruptcy Court for a determination of whether there were any funds traceable to the assets in the debtor's possession, and, if so, the District Court ordered the Bankruptcy Court to exclude those funds from the debtor's estate. In the case at bar, no such showing was made in the first instance. Hence, without a specific *res* to which the claimed constructive trust could attach, the plaintiff, under Texas and Federal law, cannot successfully meet its burden of proof. *See, Kennedy & Cohen, supra,* at 966; *Rosenberg, supra,* at 663.

The Fifth Circuit discussed the imposition of a constructive trust on property and the requirements necessary for imposition of that constructive trust under Texas Law in *Harris v. Sentry Title Co., Inc.,* 715 F.2d 941 (5th Cir.1983). The *Harris* court opined:

> In recognizing a constructive trust, the critical requirement for purposes of this case is that the parties have a confidential or fiduciary relationship prior to and apart from the transaction in question. This relationship may be established through prior joint business ventures, or other types of close, confidence-inducing relationships. It need not arise from a strict, formal fiduciary relationship. However, mere subjective confidence among business associates or the like is insufficient to support a constructive trust.

> \* \* \* \* \* \*

> The distinction between an actual trust and a constructive trust is critical. An actual trust is established by the express will of the parties, while a constructive trust is an equitable remedy based on the court's interest in preventing unjust enrichment rather than on any legally-enforceable fiduciary relationships. A constructive trust is actually not a fiduciary relationship at all but rather an equitable duty.

*Harris, supra,* at 946. (Citations omitted).

The *Harris* court further discussed the confidential or fiduciary relationship necessary for imposition of a constructive trust:

> To show a constructive trust, a plaintiff must first show, by a preponderance of the evidence, that the parties had a longstanding fiduciary or confidential, trusting relationship unrelated to the subject transaction. *Whether or not a fiduciary relationship exists is a question of fact, but whether a relationship is sufficiently longstanding to support imposition of a constructive trust is a question of law.*

> \* \* \* \* \* \*

> The other requirement for imposition of a constructive trust is that the court's failure to intervene must cause unjust enrichment.... Unjust enrichment is an equitable principle that recognizes situations where one party has received benefit at the expense of an innocent other person. The mere fact that one party has made a profit, though, is an insufficient ground to order restitution on a theory of unjust enrichment. The profit must be 'unjust' under principles of equity.

*Harris, supra,* at 948–49. (Citations omitted).

Although there was evidence that the parties dealt with each other previously, the relationship between Neochem and Behring was arguably not shown to be sufficiently long-standing and confidential as to engender a fiduciary relationship sufficient to impose a constructive trust.[5] Even if a long-standing fiduciary relationship was shown, there was no showing of breach thereof by non-segregation. *Black & Geddes, supra.* A review of Texas case law discussing constructive trusts shows that the State Courts generally require three elements before applying the equitable remedy of a constructive trust. These elements include:

(1) Breach of a long-standing fiduciary duty or actual fraud. *See, e.g., Meadows v. Bierschwale*, 516 S.W.2d 125, 128 (Tex.1974);

(2) Unjust enrichment of the wrongdoer. *See, e.g., Hudspeth v. Stoker*, 644 S.W.2d 92, 94 (Tex.Civ.App.—San Antonio 1982, writ ref'd);

(3) Tracing to an identifiable *res. See, e.g., Meadows, supra*, at 129; *accord, Pierce v. Sheldon Petroleum Co.*, 589 S.W.2d 849, 853 (Tex.Civ.App.—Amarillo 1979, no writ); *But, see, Kennedy & Cohen, supra*, at 966 (Federal law requires tracing of funds regardless of the State law requirements). Under Texas or Federal law, Plaintiff has not met its burden.

Judgment will be entered in accordance with the foregoing opinion.

## FINAL JUDGMENT

For the reasons contained in this Court's Memorandum Opinion signed this date, the Court finds that the following judgment should be entered.

It is, therefore, ORDERED that Plaintiff, Neochem Corporation, do have and take nothing of and from Defendants, Behring International, Inc. and Don Navarro, Trustee, and Plaintiff's claims for constructive trust are dismissed with prejudice.

It is further ORDERED that all relief not granted is denied.

## APPENDIX 1.

The following include regulations submitted by the parties as controlling and reviewed by the court. The regulations contained in the Appendix is not intended as an exclusive list, but are included merely to aid the reader in understanding the general regulatory scheme governing customs brokers.

### 19 CFR Ch. 1 (4–1–85 Edition)

#### United States Customs Service, Treasury

**§ 111.25 Books and papers shall be available.**

During the period of retention, the broker shall maintain his books and papers in such manner that they may readily be examined, and they shall be made available for inspection, copying, reproduction or other official use by Customs regulatory auditors or special agents in accordance with the provisions of §§ 162.1a through 162.1i within the period of retention or within any longer period of time during which they remain in the possession of the broker.

[T.D. 78–138, 43 FR 21880, May 22, 1978, as amended by T.D. 79–159, 44 FR 31968, June 4, 1979]

**§ 111.26 Interference with examination of books and papers.**

Except in accordance with the provisions of §§ 162.1a through 162.1i, a broker shall not refuse access to, conceal, remove, or destroy the whole or any part of any book or paper relating to his transactions as a broker which is being sought, or which the broker has reasonable grounds to believe may be sought, by the Treasury Department or any representative thereof, nor

---

5. A recent case containing a discussion of constructive trust as a remedy under Texas law and its relation to bankruptcy is contained in *In re Jones*, 50 B.R. 911 (Bankr.N.D.Tex.1985). *See, also,* Biery, *Constructive Trusts Under the Bankruptcy Code*, 1986 STATE BAR OF TEXAS ADVANCED BUSINESS BANKRUPTCY SEMINAR.

shall he otherwise interfere, or attempt to interfere, with any proper and lawful efforts to procure or reproduce information contained in such book or paper.

[T.D. 70–134, 35 FR 9254, June 13, 1970, as amended by T.D. 79–159, 44 FR 31968, June 4, 1979]

### § 111.27 Audit or inspection of books and papers.

The Regional Director, Regulatory Audit, shall make such audit or inspection of the books and papers required by this subpart to be kept and maintained by a broker as may be necessary to enable the district director and other proper officials of the Treasury Department to determine whether or not the broker is complying with the requirements of this part. Furthermore, the Regional Director, Regulatory Audit, and/or the special agent in charge, may inspect such books and papers to obtain information regarding specific Customs transactions for the purpose of protecting importers or the revenue of the United States. The Regional Director, Regulatory Audit, and the special agent in charge conducting an audit or inspection under this section shall submit a report of the findings to the Commissioner and the district director.

[T.D. 78–138, 43 FR 21880, May 22, 1978]

### § 111.28 Responsible supervision.

(a) *General rule.* Every licensed broker operating as a sole proprietor and every licensed member of a partnership and every licensed officer of an association or corporation which is licensed as a broker shall exercise responsible supervision and control over the transaction of the Customs business of such sole proprietorship, partnership, association, or corporation.

(b) *List of employees.* Within 30 days after the date of receipt of a written demand by the district director, a licensed customhouse broker shall submit a list of the names, addresses, social security numbers, and dates and places of birth of persons currently employed. Having furnished such a list, each licensed customhouse broker shall, within 10 days after the employment of any new personnel, advise the district director of the names, addresses, social security numbers, and dates and places of birth of any such employees. If the employment of any such person is terminated, the customhouse broker shall promptly advise the district director.

[T.D. 71–70, 36 FR 1892, Feb. 3, 1971]

### § 111.29 Diligence in correspondence and paying monies.

(a) *Due diligence by broker.* Each broker shall exercise due diligence in making financial settlements, in answering correspondence, and in preparing or assisting in the preparation and filing of documents relating to any matter handled by him as a broker. Funds received by a broker from a client for payment of duty, tax, or other debt or obligation owing to the Government shall be paid to the Government within 30 days from date of receipt or date due, whichever is later. Each broker shall within 60 days account to clients for funds received for them from the Government, or received from a client in excess of the governmental or other charges properly payable in response to the client's business. He shall account to all other persons within 30 days of receipt for all funds advanced by a client for payment of any charges, debts, or obligations due such other persons.

(b) *Notice to client of method of payment.* (1) All brokers shall provide their clients with a written notification as follows:

If you are the importer of record, payment to the broker will not relieve you of liability for Customs charges (duties, taxes, or other debts owed Customs) in the event the charges are not paid by the broker. Therefore, if you pay by check, Customs charges may be paid with a separate check payable to the "U.S. Customs Service" which shall be delivered to Customs by the broker.

(2) Brokers shall provide the information statement in paragraph (b)(1) as follows:

(i) On, or attached to, any power of attorney executed on or after September 27, 1982; and

(ii) To each active client no later than February 28, 1983, and at least once at any time within each subsequent 12–month period thereafter. An active client means a client from whom a broker has obtained a power of attorney, and for whom the broker has transacted Customs business on at least two occasions within the 12–month period preceding notification.

[T.D. 70–134, 35 FR 9254, June 13, 1970, as amended by T.D. 82–134, 47 FR 32419, July 27, 1982; T.D. 82–219, 47 FR 52139, Nov. 19, 1982]

### § 111.30 Change of business address, organization, or name; status report.

(a) *Business address.* When a broker changes his business address, he shall immediately give written notice of his new address to the Commissioner and the district director for the district in which the change of address occurs.

(b) *Organization.* A partnership, association, or corporation shall immediately notify the Commissioner and the district director of the districts where licensed of:

(1) The date on which a licensed member or officer who was one of the qualifying members or officers ceases to be a member or officer and the name of the broker who will succeed him as a qualifying member or officer; or

(2) Any change in the Articles of Agreement, Charter, or Articles of Incorporation.

(c) *Name.* A broker who changes his name, or who proposes to operate under a trade or fictitious name in one or more States within the district in which he is licensed and is authorized by State law to do so, shall submit evidence of his authority to use such name. The name shall not be used until the approval of the Commissioner has been received. In the case of a trade or fictitious name, the broker shall affix his own name in conjunction with each signature of the trade or fictitious name when signing Customs documents.

(d) *Status report.* Each customhouse broker shall file a status report with Customs on February 1, 1979, and on February 1 of each third year thereafter. A report received during the month of February will be considered filed timely. The report shall be filed with the Commissioner of Customs, U.S. Customs Service, Attention: Entry, Licensing and Restricted Merchandise Branch, Washington, D.C. 20229. A copy also shall be filed with the District Director of Customs in each district where the broker is licensed to transact Customs business. No form or particular format is required. Each individual broker shall state whether he is actively engaged in transacting business as a customhouse broker. . . .

### § 134.53 Examination packages.

(a) *Site of marking*—(1) *Customs custody.* Articles (or containers) in examination packages may be marked by the importer at the place where they have been discharged from the importing or bonded carrier or in the public stores.

(2) *Importer's premises or elsewhere.* If it is impracticable to mark the articles (or containers) in examination packages as provided in paragraph (a)(1) of this section, the merchandise may be turned over to the importer after the amount of duty, estimated to be payable under 19 U.S.C. 1304(c) has been deposited to insure compliance with the marking requirements and the payment of any additional expense which will be incurred on account of Customs supervision. (See § 134.55.) The district director may at his discretion accept the bond on Customs Form 301, containing the basic importation and entry bond conditions set forth in § 113.62 of this chapter as security for the requirements of 19 U.S.C. 1304(c) and (d).

(b) *Failure to export, destroy, or properly mark merchandise in examination packages.* If the articles (or containers) in examination packages are not exported, destroyed, or properly marked by the importer within a reasonable time (not more than 30 days), they shall be sent to general-order stores for disposition in accordance with Part 127 of this chapter, unless covered by a warehouse entry. If covered by a warehouse entry, they shall be sent to the

warehouse containing the rest of the shipment for marking prior to withdrawal.

(R.S. 251, as amended, secs. 623, as amended, 624, 46 Stat. 759, as amended (19 U.S.C. 66, 1623, 1624))

[T.D. 72–262, 37 FR 20318, Sept. 29, 1972, as amended by T.D. 78–99, 43 FR 13061, Mar. 29, 1978; T.D. 84–213, 49 FR 41183, Oct. 19, 1984]

### § 134.54 Articles released from Customs custody.

(a) *Demand for liquidated damages.* If within 30 days from the date of the notice of redelivery, or such additional period as the district director may allow for good cause shown, the importer does not properly mark or redeliver all merchandise previously released to him, the district director shall demand payment of liquidated damages incurred under the bond in an amount equal to the entered value of the articles not properly marked or redelivered, plus any estimated duty thereon as determined at the time of entry.

(b) *Failure to petition for relief.* A written petition addressed to the Commissioner of Customs for relief from the payment of liquidated damages may be filed with the district director in accord with Part 172 of this chapter. If a petition for relief from the payment of liquidated damages is not filed or payment of the liquidated damages is not made within a period of 60 days after the demand for payment, or if the liquidated damages are not paid within 60 days after the denial of the petition for relief, the district director shall in accord with Part 172 of this chapter report the matter to the U.S. attorney for collection.

(c) *Relief from full liquidated damages.* Any relief from the payment of the full liquidated damages incurred will be contingent upon the deposit of the marking duty required by section 304(c) of the Tariff Act of 1930, as amended (19 U.S.C. 1304(c)), and the satisfaction of the district director that the importer was not guilty of bad faith in permitting the illegally marked articles to be distributed, has been diligent in attempting to secure compliance with the marking requirements, and has attempted by all reasonable means to effect redelivery of the merchandise.

[T.D. 72–262, 37 FR 20318, Sept. 29, 1972, as amended by T.D. 79–159, 44 FR 31969, June 4, 1979; T.D. 83–217, 48 FR 48659, Oct. 20, 1983]

### § 134.55 Compensation of Customs officers and employees.

(a) *Time for which compensation is charged.* The time for which compensation is charged shall include all periods devoted to supervision and all periods during which Customs officers or employees are away from their regular posts of duty by reason of such assignment and for which compensation to such officers and employees is provided for by law.

(b) *Applicability*—(1) *Official hours.* The compensation of Customs officers and employees assigned to supervise the exportation, destruction, or marking of articles so as to exempt them from the application of marking duties shall be computed in accordance with § 19.5(b) of this chapter when such supervision is performed during a regularly scheduled tour of duty.

(2) *Overtime.* When such supervision is performed by a Customs officer or employee in an overtime status, the compensation with respect to the overtime shall be computed in accordance with § 24.16 of this chapter.

(c) *Expenses included.* In formulating charges for expenses pertaining to supervision of exportation, destruction, or marking, there shall be included all expenses of transportation, per diem allowance in lieu of subsistence, and all other expenses incurred by reason of such supervision from the time the Customs officer leaves his official station until he returns thereto.

(d) *Services rendered for more than one importer.* If the importations of more than one importer are concurrently supervised, the service rendered for each importer shall be regarded as a separate assignment, but the total amount of the compensation, and any expenses properly applicable to more than one importer, shall be

equitably apportioned among the importers concerned.

## PART 141—ENTRY OF MERCHANDISE

### § 141.0 Scope.

This part sets forth general requirements and procedures for the entry of imported merchandise, except entries under carnet, and entries for transportation in bond or exportation, for foreign-trade zones, or for trade fairs, which are covered in Parts 114, 18, 146, and 147 of this chapter. More specific requirements and procedures in addition to those in this part are set forth in Parts 143, 144, and 145 of this chapter for consumption, appraisement and informal entries, for warehouse entries, and for mail entries.

### § 141.0a Definitions.

Unless the context requires otherwise or a different definition is prescribed, the following terms shall have the meanings indicated when used in connection with the entry of merchandise:

(a) *Entry.* "Entry" means that documentation required by § 142.3 of this chapter to be filed with the appropriate Customs officer to secure the release of imported merchandise from Customs custody, or the act of filing that documentation.

(b) *Entry summary.* "Entry summary" means any other documentation necessary to enable Customs to assess duties, and collect statistics on imported merchandise, and determine whether other requirements of law or regulation are met.

(c) *Submission.* "Submission" means the voluntary delivery to the appropriate Customs officer of the entry summary documentation for preliminary review or of entry documentation for other purposes.

(d) *Filing.* "Filing" means:

(1) The delivery to Customs of the entry documentation required by section 484(a), Tariff Act of 1930, as amended (19 U.S.C. 1484(a)), to obtain the release of merchandise, or

(2) The delivery to Customs, together with the deposit of estimated duties, of the entry summary documentation required to assess duties, collect statistics, and determine whether other requirements of law and regulation are met, or

(3) The delivery to Customs, together with the deposit of estimated duties, of the entry summary documentation which shall serve as both the entry and the entry summary.

(e) *Presentation.* "Presentation" is used only in connection with quota-class merchandise and is defined in § 132.1(d) of this chapter.

(f) *Entered for consumption.* "Entered for consumption" means that an entry summary for consumption has been filed with Customs in proper form, with estimated duties attached.

(g) *Entered for warehouse.* "Entered for warehouse" means that an entry summary for warehouse has been filed with Customs in proper form.

(h) *Entered temporarily under bond.* "Entered temporarily under bond" means that an entry summary supporting a temporary importation under bond has been filed with Customs in proper form.

(i) *Released conditionally.* "Released conditionally" means any release from Customs custody before liquidation.

(R.S. 251, as amended, secs. 623, as amended, 624, 46 Stat. 759, as amended (19 U.S.C. 66, 1623, 1624))

[T.D. 79–221, 44 FR 46816, Aug. 9, 1979; T.D. 84–213, 49 FR 41184, Oct. 19, 1984]

## Subpart A—Liability for Duties and Requirement To Enter Merchandise

### § 141.1 Liability of importer for duties.

(a) *Time duties accrue.* Duties and the liability for their payment accrue upon imported merchandise on arrival of the importing vessel within a Customs port with the intent then and there to unlade, or at the time of arrival within the Customs territory of the United States if the merchandise arrives otherwise than by vessel, un-

less otherwise specially provided for by law.

(b) *Payment of duties*—(1) *Personal debt of importer.* The liability for duties, both regular and additional, attaching on importation, constitutes a personal debt due from the importer to the United States which can be discharged only by payment in full of all duties legally accruing, unless relieved by law or regulation. Payment to a broker covering duties does not relieve the importer of liability if the duties are not paid by the broker. The liability may be enforced notwithstanding the fact that an erroneous construction of law or regulation may have enabled the importer to pass his goods through the customhouse without payment. Delivery of a Customs bond with an entry is solely to protect the revenue of the United States and does not relieve the importer of liabilities incurred from the importation of merchandise into the United States.

(2) *Means of payment.* An importer or his agent may pay Customs by using any of the applicable means provided in § 24.-1(a).

(3) *Methods of payment.* An importer may pay duties either:

(i) Directly to Customs whether or not a licensed customhouse broker is used; or

(ii) Through a licensed customhouse broker. When an importer uses a broker and elects to pay by check or bank draft, the importer may issue the broker either:

(A) One check or bank draft payable to the broker covering both duties and the broker's fees and charges, in which case the broker shall pay the duties to Customs on behalf of the importer, or

(B) Separate checks or bank drafts, one covering duties payable to the "U.S. Customs Service," for transmittal by the broker to Customs, and the other covering the broker's fees and charges. The importer's check or bank draft for duties shall be delivered to Customs by the broker.

(c) *Prior claim against importer's estate.* The Government's claim for unpaid duties against the estate of a deceased or insolvent importer has priority over obligations to creditors other than the United States.

(d) *Lien against merchandise.* The liability for duties also constitutes a lien upon the merchandise imported which may be enforced while such merchandise is in the custody or subject to the control of the United States.

(e) *States and their instrumentalities.* Neither the States nor their instrumentalities are entitled to any constitutional exemption from the payment of Customs duties.

(f) *Unordered merchandise.* There shall be no liability for the payment of duties on the part of anyone to whom merchandise is consigned without his authority, if he refuses it. Such merchandise shall be treated as unclaimed (see Part 20 of this chapter).

(R.S. 3466, 3467, as amended; 31 U.S.C. 191, 192)

[T.D. 73–175, 38 FR 17447, July 2, 1973, as amended by T.D. 82–134, 47 FR 32419, July 27, 1982]

## § 141.2 Liability for duties on reimportation.

Dutiable merchandise imported and afterwards exported, even though duty thereon may have been paid on the first importation, is liable to duty on every subsequent importation into the Customs territory of the United States, but this does not apply to the following:

(a) Personal and household effects taken abroad by a resident of the United States and brought back on his return to this country (see § 148.31 of this chapter);

(b) Professional books, implements, instruments, and tools of trade, occupation, or employment taken abroad by an individual and brought back on his return to this country (see § 148.53 of this chapter);

(c) Automobiles and other vehicles taken abroad for noncommercial use (see § 148.-32 of this chapter);

(d) Metal boxes, casks, barrels, carboys, bags, quicksilver flasks or bottles, metal

drums, or other substantial outer containers exported from the United States empty and returned as usual containers or coverings of merchandise, or exported filled with products of the United States and returned empty or as the usual containers or coverings of merchandise (see § 10.7(b), (c), (d), and (e) of this chapter);

(e) Articles exported from the United States for repairs or alterations, which may be returned upon the payment of duty on the value of repairs or alterations at the rate or rates which would otherwise apply to the articles in their repaired or altered conditions (see § 10.8 of this chapter);

(f) Articles exported for exhibition under certain conditions (see §§ 10.66 and 10.67 of this chapter);

(g) Domestic animals taken abroad for temporary pasturage purposes and returned within 8 months (see § 10.74 of this chapter);

(h) Articles exported under lease to a foreign manufacturer (see § 10.108 of this chapter); or

(i) Any other reimported articles for which free entry is specifically provided.

## § 141.3 Liability for duties includes liability for taxes.

The importer's liability for duties includes a liability for any internal revenue taxes which attach upon the importation of merchandise, unless otherwise provided by law or regulation.

## § 141.4 Entry required.

Entry, as required by section 484(a), Tariff Act of 1930, as amended (19 U.S.C. 1484(a)), shall be made of every importation, whether free or dutiable and regardless of value, except for:

(a) The intangibles listed in general headnote 5, Tariff Schedules of the United States (19 U.S.C. 1202); and

(b) Articles specifically exempted by law or regulations from the requirement for entry.

(Sec. 498, 46 Stat. 728, as amended; 19 U.S.C. 1498)

## § 141.5 Time limit for entry.

Merchandise for which entry is required shall be entered by the consignee within 5 working days after the entry of the importing vessel or aircraft or report of the vehicle, or after the arrival at the port of destination in the case of merchandise transported in bond, unless a longer time is authorized by law or regulation, or by the district director in writing. Merchandise for which timely entry is not made shall be treated in accordance with § 4.37 and Part 127 of this chapter.

(R.S. 251, as amended, sec. 624, 46 Stat. 759 (19 U.S.C. 66, 1624))

[T.D. 73–175, 38 FR 17447, July 2, 1973, as amended by T.D. 77–12, 41 FR 56629, Dec. 29, 1976; T.D. 79–221, 44 FR 46816, Aug. 9, 1979]