In re George B. FRITTS, Debtor.

**HARDWICK BANK & TRUST COMPANY, Plaintiff,**

v.

George B. FRITTS, Defendant.

Bankruptcy No. 3–82–00672.
Adv. No. 3–82–0608.

United States Bankruptcy Court,
E.D. Tennessee.

Dec. 13, 1982.

Baker, Worthington, Crossley, Stansberry & Woolf, Imogene A. King, Knoxville, Tenn., for plaintiff.

Ayres, Parkey, Skaggs & Ware, Allen J. Ware, Jr., Knoxville, Tenn., for defendant.

## MEMORANDUM

CLIVE W. BARE, Bankruptcy Judge.

At issue in this proceeding is the dischargeability of a judgment against the debtor in the amount of $76,974.00 entered in the United States District Court for the Northern District of Georgia at Rome. Plaintiff asserts nondischargeability under 11 U.S.C.A. § 523(a)(2)(B) (1979).[1]

### I

In May 1980 the Hardwick Bank & Trust Company approved a loan to the Brown-

---

1. A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

. . . .

(2) for obtaining money, property, services, or an extension, renewal, or refinance of credit by

. . . .

(B) use of a statement in writing—

Fritts-Harris Corporation in the sum of $85,000.00. This loan represented 50% of the corporation's anticipated start-up expenses and equipment cost in opening an Orange-Julius outlet in the Walnut Square Mall in Dalton, Georgia. As collateral the Bank accepted a first security interest in the leasehold improvements and equipment. The Bank also required the unlimited personal guaranty of Joseph M. Brown, Jr. and George B. Fritts (Ex. 4). The Brown-Fritts-Harris Corporation subsequently defaulted in its payment on the loan. Following the sale of the repossessed collateral securing the loan, a deficiency judgment was entered against Fritts in favor of the Bank in the amount of $76,974.00 in the United States District Court, Northern District of Georgia.

Prior to making the loan, the Bank required Fritts, Brown, and Harris to complete and submit personal financial statements respecting their financial condition. Fritts' statement is dated March 1, 1980 (Ex. 1).

The Bank avers that it reasonably relied upon the representations made by Fritts in his financial statement. The Bank says that Fritts represented that he was the sole owner of real estate located at 1537 Cherokee Boulevard, Knoxville, Tennessee, when, in fact, he was not the sole owner of the property but instead owned the property as a tenant by the entirety with his wife.[2] The Bank further avers that Fritts' representation as to the ownership of the real property and its value was made with the intent to deceive the Bank as to his true financial condition and that the Bank has been materially harmed thereby.

Fritts denies that he furnished the financial statement with anything in it that he felt was false or misleading. He further denies that he furnished the statement with the intent to deceive. He admits that he did not disclose his wife's tenancy by the entirety interest in their residence in his financial statement but states this was an oversight and was not intended to mislead or deceive. Fritts points out that the financial statement shows that he was married and that the property on Cherokee Boulevard was his home. He says this should have put the Bank on notice that the house was jointly owned by both husband and wife if this fact was material to the Bank in approving the loan.

The critical issue relates to an omission in Item No. 5 of the financial statement which reads as follows:

"No. 5. Real Estate. The legal and equitable title to all the real estate listed in this statement is solely in the name of the undersigned, except as follows: _____
_____."

Following the above is listed a dwelling on one acre of land with a present market value of $105,300.00 and mortgages or liens thereon amounting to $28,673.00. The only signature appearing at the bottom of the page is that of George B. Fritts.

The Bank insists that because Fritts was not the sole owner of his home, as represented in the financial statement, but in fact owned the home as a tenant by the entirety, the Bank and the estate in bankruptcy have been denied access to the largest asset which might have been available to satisfy the debtor's obligations. Instead, only Fritts' survivorship interest was available to the creditors, which interest was sold by the trustee for $2,975.00. Fritts responds that, if the focal point of the loan was the equity in his house, the Bank should have made some investigation as to the status of the title, either by obtaining a title search, a credit report, or a telephone call to the Register of Deeds of Knox County requesting a copy of Fritts' deed.

(i) that is materially false;
(ii) respecting the debtor's or an insider's financial condition;
(iii) on which the creditor to whom the debtor is liable for obtaining such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive.

2. Other allegations in the Complaint concerning misrepresentations in the financial statement were withdrawn by the Bank at trial.

## II

■ In order to hold a debt nondischargeable under § 523, the court must find that the debtor obtained money, property, or services by the use of a statement in writing:

a) that is materially false,

b) respecting the debtor's financial condition,

c) on which the creditor reasonably relied, and

d) that was made or published by the debtor with intent to deceive.

■ The court has no difficulty in finding that the statement (1) relates to the debtor's financial condition and (2) that there is a financially relevant omission in the statement.[3] The omission is in the "except" clause in Item No. 5 of the financial statement which indicates that the debtor is the sole owner of the real property on Cherokee Boulevard, when, in fact as heretofore indicated, the debtor and his wife owned the property as tenants by the entirety. The difference between sole ownership and entirety ownership of property, as well as the legal effects of such ownership, i.e., the difference in the value of the fee simple and the value of only the right of survivorship, is clearly known in the business community.

The debtor in this case, although not a loan officer dealing with financial statements, is a part of that business community. He has been a senior staff appraiser with one of the leading savings and loan associations in this area for some five or six years. He is a graduate of the University of Tennessee majoring in real estate and history. He also attended a law school in Atlanta for one and a half semesters.

Fritts prepared the financial statement, having obtained the form from his employer, Home Federal. He and his wife acquired the real property in question in 1977. Fritts was never the sole owner of the property. His explanation for leaving the "except" portion in Item No. 5 blank is that:

> I left that blank because Mr. Harris and Mr. Brown and myself were going down to see Mr. Mauldin [the bank official who later approved the loan], and I assumed that the wives were going to have to sign a note also or there was going to be some kind of collateral on my house since I had been requested to list assets of both husband and wife. That's normally the experience that I had experienced in commercial; and since my wife wasn't going down, I did exactly as the other partners did and just listed my own name. (Tr. at 36, 37).

Fritts admitted that at no time did he inform the Bank that ownership rights and legal title to the residential property was jointly held by him and his wife.

Mr. Mauldin, the Bank's executive vice president who approved the loan after presenting the application and other documents to the bank's loan committee, including the financial statements, and who was told by the loan committee to "handle the loan as I saw fit," testified that he considered the financial statements in making the loan. When asked whether the Bank would have made the loan if Fritts had listed the real estate as being jointly owned with his wife, Mauldin replied:

> We would have—I feel sure based on the information that was given to us that we would have made the loan. However, I feel like we would probably have asked his wife to sign the guaranty also. (Tr. at 17).

---

**3.** An omission that is relevant financially does not necessarily mean that a financial statement is "materially false." The word "false" as used in section 14(c)(3) of the former Bankruptcy Act meant false in the sense of being "intentionally untrue." *Third Nat'l Bank v. Schatten,* 81 F.2d 538, 540 (6th Cir.1936), citing *Franklin v. Monning Dry Goods Co.,* 217 F. 929, 932 (5th Cir.1914). The following quotation is from the opinion in *Schatten:*

In construing the same section [section 14(b)(3) was relettered 14(c)(3) subsequent to the decision in *Schatten* ] we said in *Firestone v. Harvey* (C.C.A.) 174 F. 574, 577: "The false statement in writing which is enough to deny a discharge implies a statement knowingly false, or made recklessly, without an honest belief in its truth, and with a purpose to mislead or deceive." *Schatten,* 81 F.2d at 540.

Mauldin also testified that in most small closely held corporations or new ventures the personal guaranties of the individuals were "pretty commonplace."

In the business context in which this transaction occurred, the court finds that the Bank "reasonably relied" upon the financial statement in extending the loan;[4] further, the Bank's failure to request the debtor's wife to execute the guaranty agreement was the result of the debtor indicating on the statement that the legal and equitable title to the real estate "is solely in the name of the undersigned [George B. Fritts]."[5]

This leaves for determination by the court whether the debtor caused the statement to be made or published "with intent to deceive." 11 U.S.C.A. § 523(a)(2)(B)(iv) (1979).

Section 523(a)(2) of the Bankruptcy Code is changed only slightly from § 17a(2) of the former Bankruptcy Act.[6] There is no doubt that the fraud or deceit referred to in § 17a(2) of the Bankruptcy Act meant positive fraud or fraud in fact, involving moral turpitude or intentional wrong and not implied fraud, which may exist without the imputation of bad faith or immorality. *See Williams v. United States Fidelity & Guar. Co.,* 236 U.S. 549, 35 S.Ct. 289, 59 L.Ed. 713 (1915); *Neal v. Clark,* 95 U.S. 704, 24 L.Ed. 586 (1878); *Western Union Cold Storage Co. v. Hurd,* 116 F. 442 (W.D.Mo.1902);

*United States v. Syros,* 254 F.Supp. 195 (E.D.Mo.1966); 1A Collier on Bankruptcy, ¶ 17.16[3] (14th Ed.1973). "Prior decisions unanimously require proof of actual fraud involving moral turpitude .... 'In order for Section 17, sub. a(2) to bar a discharge, the party alleging fraud must meet the requirements of proving positive fraud ....'" *Wright v. Lubinko,* 515 F.2d 260, 263 (9th Cir.1975) (quoting *In re Dolnick,* 374 F.Supp. 84, 90 (N.D.Ill.1974)).

■ Furthermore, fraud is never presumed; it must be proven. *Snapp v. Moore,* 2 Tenn. 236 (1814). Absent the existence of a fiduciary relationship, fraud must be proven by "clear and cogent" evidence. *Groves v. Witherspoon,* 379 F.Supp. 52 (E.D.Tenn.1974).

■ The plaintiff has the burden of proving the facts essential to its objection. Rules Bankr.Proc. Rule 407, 11 U.S.C.A. The burden of persuasion remains on the creditor even though a creditor may establish a prima facie case and shift the burden to the debtor of going forward with evidence to disprove the averred intent to deceive.

Fritts testified that he did not intend to deceive the Bank. An unsupported assertion of an honest intent may not overcome natural inferences from admitted facts. 1A Collier on Bankruptcy, ¶ 14.40 (14th ed.

---

**4.** Counsel for the debtor insists that the reliance by the Bank on the representations in Fritts' financial statement was not reasonable. This insistence is based on (1) the failure of the Bank to investigate the status of the title to the marital residence, obtain an appraisal of the property, and require a mortgage of the property by Fritts, (2) the limited contact between the Bank and Fritts and the Bank's failure to obtain a credit report on Fritts, and (3) the testimony of Fritts that, on the occasion of his trip to Dalton when he signed his personal guaranty, Mauldin stated that the Bank was "basically going on the recommendation of First Tennessee Bank on Mr. Brown as to his financial statement, business success and personal relationship with that bank." (Tr. at 39, 40). Admittedly, Fritts' equity in the marital residence could be extinguished by any number of events. Under the circumstances, however, the Bank did not deem it necessary to require a mortgage on his residence from Fritts. That decision

does not mean that the Bank's reliance on Fritts' financial statement was not reasonable.

**5.** In Item No. 4 of the statement Fritts indicated that certain stocks were registered in the name of "Husband & Wife."

**6.** Section 17a(2) of the Bankruptcy Act provided for exception from discharge of provable debts which "are liabilities for obtaining money or property by false pretenses or false representations, or for obtaining money or property on credit or obtaining an extension or renewal of credit in reliance upon a materially false statement in writing respecting his financial condition made or published or caused to be made or published in any manner whatsoever with intent to deceive ...." 11 U.S.C.A. § 35 (Supp.1979), *repealed by* Bankruptcy Reform Act of 1978, 92 Stat. 2549.

1973). Fritts, however, introduced the financial statement (Ex. 3) of Joseph M. Brown, Jr., one of his former partners, to support his contention that he did not intend to deceive the Bank. Brown's financial statement, which was also required by the Bank, is dated March 6, 1980, and reflects total assets of $1,194,000.00 and a net worth of $960,400.00. The record does not disclose whether Fritts was privy to the information provided in Brown's financial statement at the time of the completion of his own statement.[7] Nonetheless, Fritts certainly must have been generally aware of Brown's assets and financial condition. They were business partners in a corporation, and Brown's interest in two different established businesses in the community was certainly no secret. Under the circumstances, it is simply unreasonable to infer that Fritts intended to deceive the Bank when he prepared his financial statement for the purpose of jointly obtaining an $85,-000.00 loan with his two partners.

■ Considering the remedial purpose of the bankruptcy laws, exceptions to dischargeability of an obligation in bankruptcy are strictly construed, and evidence is to be viewed in a light most favorable to the debtor. *See In re Collins,* 1 B.R. 147 (Bankr.E.D.Tenn.1979). The evidence regarding an intent to deceive is certainly not "clear and cogent," and, in fact, does not preponderate in favor of finding an intent to deceive.

The debtor's obligation to the Bank is dischargeable since an intent to deceive the Bank by failing to note in the financial statement the ownership interest of the wife has not been established. The debtor, however, is not entitled to recover a reasonable attorney fee from the Bank pursuant to 11 U.S.C.A. § 523(d) (1979), since recovery is limited to cases challenging the dischargeability of a consumer debt, defined as a "debt incurred by an individual primarily for a personal, family, or household pur-

pose." 11 U.S.C.A. § 101(7) (1979). The debt at issue was incurred as a corporate debt for a commercial purpose.

This Memorandum constitutes findings of fact and conclusions of law pursuant to Bankruptcy Rule 752.

---

7. Fritts' financial statement is dated March 1, 1980. His testimony appears to be inconsistent insofar as the date of preparation of his financial statement (Tr. at 27, 35). However, he may have prepared two identical financial statements on different dates. The financial statement which Fritts gave to Brown for delivery to the Bank may not have been completed until April or May 1980.