**In re W.L. BRADLEY COMPANY, INC., Debtor.**

**Bankruptcy No. 86–01936G.**

United States Bankruptcy Court,
E.D. Pennsylvania.

June 17, 1987.

Jeffrey M. Chebot, Philadelphia, Pa., for movant, Sunkist Growers, Inc.

Kevin W. Walsh, Adelman Lavine Krasny Gold & Levin, Philadelphia, Pa., for debtor, W.L. Bradley Co.

## OPINION

BRUCE FOX, Bankruptcy Judge:

The debtor, W.L. Bradley Co., Inc., filed a voluntary petition under chapter 11 of the Bankruptcy Code on April 18, 1986. Prior to its filing, the debtor was engaged in the business of wholesale distribution of fruits and vegetables. It terminated its business operations on or about March 24, 1986, shortly before its bankruptcy filing.

On December 22, 1986, Sunkist Growers, Inc. ("Sunkist") filed a motion "for relief from the automatic stay under section 362(a) and for turnover of property not part of debtor's estate; and for abandonment and possession of trust corpus under section 554(b) and for interest and attorneys' fees." In its motion, Sunkist assert-

ed that it holds a perfected interest as a trust beneficiary in the amount of $72,-361.02 in a nonsegregated, floating trust pursuant to the Perishable Agricultural Commodities Act, as amended, 7 U.S.C. § 499e(c) ("PACA"). Attached to the motion were various invoices evidencing Sunkist's sale of citrus fruit to the debtor in early 1986 and certain notices Sunkist sent to the U.S. Department of Agriculture ("USDA") and the debtor in an effort to perfect the alleged PACA trust. Since Sunkist has not been paid for the fruit, its motion requested that the court order the debtor to make immediate payment of the $72,361.02, plus prejudgment and post-judgment interest, and schedule a hearing for the purpose of awarding Sunkist attorney's fees and costs. The debtor filed an answer to the motion, denying most of Sunkist's factual averments and raising a number of affirmative defenses.

A hearing on Sunkist's motion was held and, at that time, Sunkist advised the court that it would not press any claim for trust status for four of the nine invoices at issue.[1] As a result, the parties agreed that the sum in dispute amounts to $37,585.90.[2] After the conclusion of testimony, the parties also agreed that if the court upheld Sunkist's status as a PACA trust claimant, its request for interest, attorney's fees and costs would be considered at a later hearing.

Based on the findings of fact and conclusions of law set forth below, I hold that: (1) pursuant to PACA, the debtor is holding $37,585.90 in trust for Sunkist; (2) Sunkist is entitled to relief from the automatic stay; and (3) the debtor should be required to promptly pay the trust funds to Sunkist.[3]

## FINDINGS OF FACT

1. The debtor filed a voluntary petition under chapter 11 of the Bankruptcy Code on April 18, 1986.

2. Prior to its bankruptcy filing, the debtor was engaged in the business of wholesale distribution of fruits and vegetables and ceased doing business on or about March 24, 1986.

3. The debtor received no income other than from the operation of its business of wholesale distribution of fruits and vegetables during the two years preceding the filing of its bankruptcy petition.

4. In the year and one half period prior to its bankruptcy filing, the debtor engaged in approximately 225 business transactions with Sunkist.

5. The debtor is obligated to Sunkist in the amount of $37,585.90, for citrus fruits purchased by the debtor under the terms and conditions of the following invoices:

| Invoice Number | Date Shipped | Invoice Date | Amount |
|---|---|---|---|
| 21–10192 | 3/6/86 | 3/15/86 | $6,600.00 |
| 02–36216 | 3/17/86 | 3/26/86 | $8,738.70 |
| 02–36217 | 3/17/86 | 3/27/86 | $7,808.00 |
| 02–35963 | 3/13/87 | 3/28/86 | $5,737.50 |
| 02–36484 | 3/19/86 | 3/28/86 | $8,825.25 [4] |

6. Each invoice reflects fruit ordered by the debtor from Sunkist and sold by Sunkist to the debtor. The debtor received all of the ordered fruit.

7. Payment under each invoice was due ten days after the invoice date.

8. Sunkist sent the debtor and the USDA notice of intent to preserve trust benefits, pursuant to PACA, under the sales invoices as follows:

---

1. With respect to those four invoices, the debtor had challenged Sunkist's claim on the ground, *inter alia,* that Sunkist had not perfected its trust status in a timely manner.

2. At the hearing, the debtor made clear that it does not dispute that it received the shipments of fruit and that their price was $37,585.90. It disputes only whether Sunkist should be accorded PACA trust claimant status.

3. As a result of this decision, it is unnecessary to rule on Sunkist's motion for abandonment under 11 U.S.C. § 554(b).

4. The sum of these invoices is $37,709.45. The parties agree that the present indebtedness is only $37,585.90, apparently due to the application of a credit in favor of the debtor.

| Invoice Number | Date of Notice to Debtor | Date of Notice filed with USDA |
|---|---|---|
| 21–10192 | 3/14/86 | 3/17/86 |
| 02–36216 | 4/7/86 | 4/10/86 |
| 02–36217 | 4/7/86 | 4/10/86 |
| 02–35963 | 4/7/86 | 4/10/86 |
| 02–36484 | 4/7/86 | 4/10/86 |

9. To date, the debtor has not paid Sunkist for the citrus fruit supplied under the sales invoices described in paragraph 5 above.

10. The debtor is also obligated to Sunkist in the amount of $34,865.12 for citrus fruits purchased by the debtor under the terms and conditions of four invoices numbered 20–10261, 45–10809, 45–10860, 02–35963 ("the second group of invoices").

11. With respect to the second group of invoices, Sunkist filed notices of intent to preserve trust benefits with the USDA pursuant to PACA which represented that the notices were being filed within forty days of the invoice date· and thirty days of the payment due date.

12. The actual invoices which comprise the second group contain information inconsistent with that set forth in the notices sent to the USDA by Sunkist. Specifically, a comparison of the notices with the actual invoices suggests that the notices were filed more than forty days after the invoice date and more than thirty days after the payment due date.

13. Based on the information contained in invoices comprising the second group, the debtor asserted before this court that the trust notices were not timely under PACA. Sunkist thereupon withdrew its request for trust status with respect to second group of invoices.

14. Although it has conducted no business since filing its chapter 11 bankruptcy, the debtor still holds a license to engage in its prepetition activities from the USDA under PACA.

15. As of December 17, 1986, the debtor maintained $150,344.86 on deposit in an insured money market account with Fidelity Bank.

16. The funds in the money market account constitute a commingled fund of proceeds from sales of perishable agricultural products.

17. The debtor's prospects for reorganization are dependent upon collecting an account receivable owed by Joseph Russo, who himself is a bankruptcy debtor in the United States Bankruptcy Court for the Southern District of New York. Litigation on the claim has been commenced in the New York court.

18. As of the date of trial, debtor's bankruptcy filing, the only expenditure from the debtor's money market account has been a single $60.00 disbursement in connection with the Russo litigation in New York.[5]

19. The debtor is aware of another creditor, Gwin, White & Prince, which claims the status of a trust beneficiary under PACA.

20. On its schedules, the debtor has listed priority claims in excess of $10,000.00 and a secured claim in the amount of $250,-000.00.

21. The debtor believes that if it is required to pay Sunkist and Gwin, White & Prince the amounts they are demanding as PACA trust claimants, all of the debtor's funds on hand will be consumed and the debtor will be unable to consummate a plan of reorganization.

## DISCUSSION AND CONCLUSIONS OF LAW

Sunkist's claim in this matter is derived from the amendments to PACA enacted by Congress in 1984. Before discussing the legal issues arising in the case *sub judice*, it is helpful to first briefly outline the purpose of the PACA trust provisions and the manner in which they operate.

In amending PACA in 1984, Congress made a finding that financing arrangements, which allow purchasers of perishable agricultural commodities who have not yet paid for the commodities to give lenders a security interest in the purchased fruit and vegetables, constitute a "burden on commerce" and are "contrary to the

---

**5.** Since trial, a small administrative expense claim has been allowed.

public interest." 7 U.S.C. § 499e(c)(1). The legislative history explains:

Sellers of agricultural commodities are often located thousands of miles from their customers. Sales transactions must be made quickly or they are not made at all.... Under such conditions, it is often difficult to make credit checks, conditional sales agreements, and take other traditional safeguards.

. . . . .

Many [buyers], in the ordinary course of their business transactions, operate on bank loans secured by [their] inventories, proceeds or assigned receivables from sales of perishable agricultural commodities, giving the lender a secured position in the case of insolvency. Under present law, sellers of fresh fruits and vegetables are unsecured creditors and receive litle protection in any suit for recovery of damages where a buyer has failed to make payment as required by the contract.

In recent years, produce sellers have been subjected to increased instances of buyers failure to pay and slow payments.

H.R. No. 98–543, 98th Cong., 1st Sess. 3 (1983) ("House Report"), U.S.Code Cong. & Admin.News 1984, pp. 405, 406.

To deal with this perceived problem, Congress amended PACA "to increase the legal protection for unpaid sellers and suppliers of perishable agricultural commodities until full payment of sums due have been received by them" in the form of a non-segregated, floating trust that applies to the commodities, products derived therefrom and any receivable or proceeds from their sale in the hands of the buyer. *Id.* at 1. The statutory authority for the trust is codified at 7 U.S.C. § 499e(c)(2).[6] As one court has explained, an unpaid obligation

"becomes a trust obligation of the [buyer], prior to and superior to any lien or security interest in inventory held by the dealer's secured lender." *In re Prange Foods, Corp.,* 63 B.R. 211, 214 (Bankr.W.D.Mich. 1986). The legislative history expressly notes that the PACA trust was modeled on the trust amendments to the Packers and Stockyards Act ("PSA") enacted in 1976, *see* 7 U.S.C. § 196. House Report at 4. As a result, courts have looked to decisions under the PSA trust amendments for guidance in construing the PACA trust provisions. *See In re Monterey House, Inc.,* 71 B.R. 244 (Bankr.S.D.Tex.1986); *In re Fresh Approach, Inc.,* 51 B.R. 412 (Bankr.N.D. Tex.1985) (*Fresh Approach II*).

■ The statutory trust operates in favor of "all unpaid suppliers or sellers of such commodities or agents involved in the transaction." 7 U.S.C. § 499e(c)(2). In order to perfect its status as trust beneficiary, a seller, supplier or agent must file a notice of its trust claim with the USDA within thirty days after payment has fallen due. 7 C.F.R. § 46.46(g). Once the seller has perfected its status, it has no obligation to trace the assets to which its trust applies. The trust is "floating" and applies to all of the buyer's produce related inventory and proceeds thereof, regardless whether the trust beneficiary or another seller was the source of the inventory and proceeds thereof. House Report at 5; *Fresh Approach II,* 51 B.R. at 422; *In re Fresh Approach, Inc.,* 48 B.R. 926, 931 (Bankr.N.D.Tex.1985) (*Fresh Approach I*). *See also* 7 C.F.R. § 46.46(c).

With these principles in mind, I turn to the four main arguments raised by the debtor in opposition to Sunkist's request for relief.[7]

---

**6.** 7 U.S.C. § 499e(c)(2) provides, in pertinent part:

Perishable agricultural commodities received by a commission merchant, dealer, or broker in all transactions, and all inventories of food or other products derived from perishable agricultural commodities, and any receivables or proceeds from the sale of such commodities or products, shall be held by such commission merchant, dealer, or broker in trust for the benefit of all unpaid suppliers

or sellers of such commodities or agents involved in the transaction, until full payment of the sums owing in connection with such transactions has been received by such unpaid suppliers, sellers, or agents....

**7.** The debtor also argues that Sunkist's perfection of its PACA trust claims constitutes an avoidable preference, *see* 11 U.S.C. § 547, devoting two pages of its twenty eight page memorandum to the issue. Based on the analysis set

### A. Sunkist's Eligibility As a PACA Trust Claimant

The debtor's lead argument in opposition to Sunkist's motion is that Sunkist has not established that it is eligible to be a PACA trust claimant. The statute creates a trust "for the benefit of all unpaid suppliers or sellers of ... commodities or agents involved in the transaction...." 7 U.S.C. § 499e(c)(2). The evidence at trial established that the debtor and Sunkist entered into contracts for the purchase of citrus fruit. There was also some evidence that suggested the fruit was actually packed and shipped by entities other than Sunkist, although Sunkist's name was on the fruit itself and the cartons used for shipping. Based on this record, the debtor argues that Sunkist has not sufficiently established its role in the transaction, or its relationship to the other entities that were apparently involved, to warrant a finding that it is a supplier, seller or agent under PACA.

The terms "supplier," "seller" and "agent" are not defined in the statute, rendering their interpretation somewhat more difficult. It is also troubling that Sunkist did not better explicate its role in the transactions at issue. Nevertheless, I conclude that Sunkist has properly invoked the trust provisions of PACA.

■ When, as here, a statute does not define a term, courts will presume that the legislative purpose is expressed by the ordinary meaning of the words used. *Russello v. United States*, 464 U.S. 16, 21, 104 S.Ct. 296, 299, 78 L.Ed.2d 17 (1983); *Diamond v. Diehr*, 450 U.S. 175, 182, 101 S.Ct. 1048, 1054, 67 L.Ed.2d 155 (1981). Under this canon of statutory construction, there can be little doubt that Sunkist is a seller or a supplier under PACA. While Sunkist's exact role in the marketing chain may not be fully clear, record establishes that Sunkist entered into contracts to sell the fruit to the debtor and was the "seller" in the

transaction. Also, in the ordinary usage of the term, Sunkist "supplied" the fruit to the debtor.

The legislative history confirms that the use of the common meaning of the statutory terms will effectuate Congress' intent:

> In the marketing of perishable agricultural commodities, there are many varied business arrangements resulting in the movement of these commodities from the farm to shipping point and to destination markets and ultimately the consumer. They include but are not limited to consignments, joint ventures, and grower agency arrangements. In a joint venture, it is common for one of the joint ventures to gain ownership, possession or control of the goods for the purpose of marketing the goods. In that situation, a trust relationship arises as between the joint venture partner which has marketing responsibility and all other joint venturers. Another trust relationshp [sic] is established in the person or entity which gains ownership, possession or control of the goods from the joint venturers.

> .    .    .    .    .

> As each supplier, seller, or agent transfers ownership, possession, or control of perishable agricultural commodities to a commission merchant, dealer, or broker, such supplier, seller, or agent will automatically become a participant in the trust.

House Report at 5, U.S.Code Cong. & Admin.News 1984, p. 408.

The import of the passage quoted above is that Sunkist may have legal obligations to other entities from which it may have obtained the fruit it sold to the debtor; those obligations may even be in the form of a trust. However, Sunkist's relationships with other entities do not detract from its seller/supplier relationship with the debtor or its status as a PACA trust beneficiary with respect to the debtor. In short, the debtor's implicit argument [8] that

---

forth in *Fresh Approach II*, 51 B.R. at 422–24, I reject the debtor's argument. *See also* 11 U.S.C. § 547(c).

8. The debtor explicitly argues that entities which are only "agents" or "sellers" were not intended by Congress as trust beneficiaries; *i.e.*, that the only intended beneficiaries are growers of perishable agricultural commodities. Both

some entity other than Sunkist is the sole, proper PACA trust beneficiary is unwarranted. It is therefore unnecessary to ascertain the precise nature of Sunkist's relationship with other companies which may have been involved in the packing and shipping of the subject fruit to the debtor.

B. *The Validity of the Trust Notice Filed for Invoice Number 21–10192*

■ As set forth in Finding of Fact Nos. 5, 7, invoice number 21–10192 shows a shipping date of March 6, 1986, an invoice date of March 15, 1986 and therefore a payment due date of March 25, 1986. Sunkist sent its notice of intent to preserve trust benefits to the USDA on March 14, 1986 and the notice was received there on March 17, 1986, eight days before payment was due. Findings of Fact Nos. 7, 8.

PACA provides:

The unpaid supplier, seller, or agent shall lose the benefits of such trust unless such person has given written notice of intent to preserve the benefits of the trust to the commission merchant, dealer, or broker and has filed such notice with the Secretary *within thirty calendar days* (i) *after* expiration of the time prescribed by which payment must be made as set forth in regulations issued by the Secretary (ii) *after* expiration of such other time by which payment must be made, as the parties have expressly agreed to in writing before entering into the transaction, or (iii) *after* the time the supplier, seller, or agent has received notice that the payment instrument promptly presented for payment has been dishonored.

7 U.S.C. § 499e(c)(3) (emphasis added); *accord,* 7 C.F.R. § 46.46(g).

Placing great emphasis on the use of the word "after," the debtor argues that Sunkist did not preserve its status as a trust beneficiary because its notice was filed *before* the expiration of the time deadline for payment of the invoice. In response, Sunk-

ist asserts that it has satisfied the literal requirement of the statute and regulations, *i.e.,* its notice was on file with the USDA within thirty days after the payment had fallen due. In effect, the debtor requests that the court construe the statute to require strict, technical compliance with at least one reading of its terms; Sunkist, on the other hand, would have the court construe the statutory and regulatory provisions as imposing no "ripeness" requirement for filing a notice, but only a limitations period. There are no cases under PACA or PSA on this issue.

While the answer to the question posed by the parties is not clear cut, I conclude that Sunkist's interpretation of the statute and regulation is the better of the two. Initially, I fail to see what policy goal is served by invalidating a trust notice filed before the buyer's payment is in default. If the filing of the notice actually created the trust, a requirement that the seller await some time period could have some practical, industry-wide significance. However, as the court explained in *Fresh Approach II,* "the beneficial interest arises, by operation of law, upon delivery to a dealer of qualifying produce, and said interest exists unless and until either the claim is satisfied or the beneficiary fails to take the neessary steps to perfect." 51 B.R. at 423. Thus, the trust seems to arise upon delivery rather than upon the failure to make timely payment. Conversely, I am unaware of any practical difficulties (other than increased paperwork for the contracting parties and the USDA) if a "premature" filing were found valid. Finally, I am guided by the general legislative intent to establish increased protection and an effective remedy for sellers, suppliers and agents. I will therefore, resolve any ambiguity in favor of Sunkist. *Cf. Pennsylvania Agricultural Cooperative Marketing Association v. Ezra Martin Co.,* 495 F.Supp. 565 (M.D.Pa.1980) (PSA is to be

the plain language of the statute and the legislative history lead me to reject this theory. *See* 7 U.S.C. § 499e(c)(2) (referring to unpaid suppliers *or* sellers *or* agents); House Report at 5, U.S.Code Cong. & Admin.News 1984, p. 408. ("It is intended that the amount claimable

against the trust *by a seller supplier, including a grower* will be the net amount due him after allowable deductions for expenses or advances of the buyer, grower's agent, commission merchant, or receiver.").

construed liberally to prevent economic harm to its intended beneficiaries). In sum, the statutory use of the word, "after," marks the beginning of the thirty day period and does not prohibit an early filing.

### C. *The Debtor's Allegation of Unclean Hands and Request for Equitable Subordination*

As explained earlier, Sunkist withdrew at trial its claim of trust status for four invoices in response to the debtor's assertion in this court that Sunkist's notices to the USDA of its intent to preserve trust benefits for those four invoices were not timely under 7 U.S.C. § 499e(c)(3) and 7 C.F.R. § 46.46(g). Based on this sequence of events, the debtor suggests that Sunkist notices to the USDA misrepresented the facts and argues that the court should deny Sunkist all the relief it requests.

■ The debtor invokes the equitable doctrine that a party seeking relief must come into court in good faith and with clean hands. *E.g., Ciba-Geigy Corp. v. Bolar Pharmaceutical Co.,* 747 F.2d 844 (3d Cir.1984), *cert. denied,* 471 U.S. 1137, 105 S.Ct. 2678, 86 L.Ed.2d 696 (1985); *American Bell, Inc. v. Federation of Telephone Workers,* 736 F.2d 879 (3d Cir.1984); *In re Midwest Processing Co.,* 41 B.R. 90 (D.N.D.1984). In the alternative, the debtor invokes the doctrine of equitable subordination, *see* 11 U.S.C. § 510(c)(1), which may be applied when: (1) the claimant has engaged in inequitable conduct; (2) the misconduct has resulted in injury to other creditors or has conferred an unfair advantage on the claimant; (3) equitable subordination would not otherwise be inconsistent with the provisions of the Bankruptcy Code. *E.g., In re Multiponics, Inc.,* 622 F.2d 709 (5th Cir.1980); *In re Mobile Steel Co.,* 563 F.2d 692 (5th Cir.1977); *In re Americana Apparel, Inc.,* 55 B.R. 160 (Bankr.E.D.Pa.1985). 3 *Collier on Bankruptcy* ¶ 510.05[1], [2] (15th ed. 1987) ("Collier").

■ The debtor's argument fails due to insufficient evidence. The debtor established only that the information on the challenged invoices differed from the information sent to the USDA. There are many possible explanations for the discrepancies, including error and oversight. From the bare discrepancies only, the debtor requests that the court infer that Sunkist's conduct was intentional and fraudulent. I cannot do so. *Compare Silver v. Nelson,* 610 F.Supp. 505 (W.D.La.1985) (fraud is never presumed and may not be inferred from circumstances which at most create only suspicion); *In re Brown,* 419 F.Supp. 199 (E.D.Va.1975) (fraud is never presumed but must be proved by clear and convincing evidence); *In re Fritts,* 26 B.R. 43 (Bankr. E.D.Tenn.1982) (same as *Brown*) *with Quintel Corp., N.V. v. Citibank, N.A.,* 606 F.Supp. 898 (S.D.N.Y.1985) (intent to defraud may be inferred from circumstantial evidence where there is sufficient supporting evidence).

In evaluating Sunkist's good faith, I note also that Sunkist attached copies of all of the invoices upon which the challenged trust claims were based to its motion in this court. It thus appears that Sunkist made no effort to conceal the particulars of the four withdrawn trust claims from either the debtor or the court. Moreover, the debtor has not shown any injury has resulted to any party in interest from the alleged misrepresentations. In these circumstances, I decline to invoke either the doctrine of unclean hands or equitable subordination to deny Sunkist the relief it has requested.

### D. *The Relationship of PACA to the Bankruptcy Code*

■ Next, the debtor argues that the fundamental principle of equality of distribution embodied in the Bankruptcy Code must override the trust provisions of PACA. The debtor asserts that nothing in PACA dictates that PACA claims be accorded preferred status in a bankruptcy proceeding and submits that those courts which have uniformly construed PACA "to the detriment and exclusion of the bankruptcy legislation" are misguided. Debtor's Memorandum of Law at 25.[9]

---

**9.** The debtor also suggests that a PACA trust "is

nothing more or less then [sic] an undisclosed

This argument is easily rejected. The legislative history of the Bankruptcy Code itself expresses Congress' intent to honor statutory trust provisions such as that found in PACA.

> [11 U.S.C. § 541] and proposed 11 U.S.C. § 545 also will not affect various statutory provisions that give a creditor of the debtor a lien that is valid outside as well as inside bankruptcy, or that creates a trust fund for the benefit of a creditor of the debtor. *See* Packers and Stockyards Act § 206, 7 P.S. § 196.

H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 368 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6324.

There is no reason to believe that Congress' intent to respect the PSA trust provision is not equally applicable to PACA. Moreover, while there is no express reference in PACA's legislative history to the earlier Bankruptcy Code, it is obvious that a buyer's bankruptcy filing would be among the circumstances which would result in late payment or no payment at all to sellers, suppliers or agents. *Accord, In re Prange Foods, Corp.*, 63 B.R. at 218 n. 4; 49 Fed.Reg. 45735, 45738 (Nov. 20, 1984) (explanatory note to PACA trust regulations states that if buyer files a bankruptcy, trust assets are not to be considered part of the bankruptcy estate).

In short, the Bankruptcy Code principle of equality of distribution was created by Congress and it is within Congress' province to create exceptions to the principle. Congress has done so, for certain statutory trusts arising under federal law. I see no reason to conclude that the statutory rights of a PACA seller, supplier or agent should be nullified simply because the buyer files a bankruptcy petition.

### E. *Relief*

■ The preceding discussion dictates the conclusion that $37,585.90 of the funds in the debtor's money market account are being held in trust for Sunkist. As the corpus of a trust in favor of a non-debtor beneficiary, those funds are not property of the debtor's estate. 11 U.S.C. § 541(d). *In re Monterey House, Inc.; Fresh Approach II.* Nevertheless, Sunkist concedes that it must obtain relief from the automatic stay in order to take action to obtain payment from the debtor of the trust proceeds. *See* 11 U.S.C. § 362(a)(3) (stays act to obtain property *of* the estate *or* property *from* the estate); 2 *Collier* ¶ 362.04[3], at 362–34. (automatic stay protects property "in the possession of the estate"). In this case, Sunkist not only seeks relief from stay, but also an order directing the debtor to deliver the funds.[10] In response, the debtor argues that the trust funds are adequately protected and it should be allowed to continue to use the funds, particularly since it may not be able to reorganize without the use of the money.

I conclude that Sunkist is entitled to relief from stay and immediate payment from the debtor. My decision is based on the legislative purpose in the enactment of the PACA trust provision, which was to "assur[e] ... that raw products will be paid for promptly." House Report at 4. As the

---

and secret priority" as to other creditors and bona fide purchasers. Debtor's Memorandum of Law at 24. This argument is hard to fathom since notice of the trust is given to both the buyer (the debtor herein) and to the USDA. Moreover, the legislative history expressly notes:

> [T]he statutory trust requirements will not be a burden to the lending institutions. They will be known to and considered by prospective lenders in extending credit.... Prompt payment should generate trade confidence and new business which yields increased cash and receivables, the prime security factors to the money lender.

House Report at 4, U.S.Code Cong. & Admin. News 1984, p. 407.

10. Sunkist's motion could have been limited to a request for relief from stay for the purpose of instituting an action against the debtor in federal district court. *See* 7 U.S.C. § 499e(c)(4) (providing for federal jurisdiction of actions by trust beneficiaries to enforce payment from the trust). By requesting payment, Sunkist sought relief which, arguably, should have been instituted by adversary proceeding. *See* Bankr.Rule 7001(1). Since the debtor has not objected to the procedure, trial has been completed and the matter has been under advisement for a few months, I deem it equitable to consider Sunkist's demand for payment on its merits. *See In re Stern*, 70 B.R. 472, 473 n. 1. (Bankr.E.D.Pa. 1987).

court cogently explained in *Fresh Approach II*:

It must be remembered that PACA was not enacted to protect those in Debtor's shoes, but rather to prevent the chaos and disruption in the flow of perishable agricultural commodities sure to result from an industry-wide proliferation of unpaid obligations. While in isolation, this may seem a harsh course to follow, in the macroeconomic sense PACA serves to ensure continuity of payment and therefore survival of the industry. Congress has plainly decided it would be less disastrous to risk the liquidation of a single purchaser than to threaten the entire production chain with insolvency. It is not the function of this Court to pass upon the wisdom of that decision.

51 B.R. at 420.

Given the clear expression of legislative intent, I cannot grant the debtors request for permission to continue to use the trust funds and to pay the trust obligation in full through a plan of reorganization. *Fresh Approach II; see In re Monterey House; cf. In re Dieckhaus Stationers of King of Prussia, Inc.*, 73 B.R. 969 (Bankr.E.D.Pa. 1987) (immediate payment of administrative expense claim ordered because 11 U.S.C. § 365(d)(4) expresses legislative intent that trustee be required to pay nonresidential real property lease obligations "on time" pending assumption or rejection of the lease).[11]

An order in accordance with this opinion will be entered.[12]

### ORDER

AND NOW, this 17 day of June, 1987, upon consideration of the motion of Sunkist Growers, Inc. ("Sunkist") for relief from the automatic stay under section 362(a) and for turnover of property not part of debtor's estate and for abandonment and possession of trust corpus under section 554(b) and for interest and attorney's fees, the debtor's response thereto and after notice and hearing, it is ORDERED that:

1. The motion for relief from stay is granted.

2. The debtor shall promptly pay Sunkist the sum of $37,585.90.

3. A hearing will be held on July 27, 1987, to consider Sunkist's request for payment of interest and attorney's fees, at 10 A.M.

---

11. Therefore, I need not determine whether the debtor has provided Sunkist with adequate protection in this case. Nor do I decide if a bankruptcy trustee is obliged to deliver trust property to the beneficiary upon demand for trusts other than those created by PACA. *Compare Georgia Pacific Corp. v. Sigma Service Corp.,* 712 F.2d 962, 968 (5th Cir.1983) (stating, in dictum, that bankruptcy court has power "to recognize the [trust beneficiary's] equitable interest ... *or to issue protective order prohibiting or conditioning its use,* if a cash equivalent, but then holding that funds impressed with a constructive trust must be paid to the beneficiary) (emphasis added), *cited in, Matter of Quality Holstein Leasing,* 752 F.2d 1009, 1012 (5th Cir.1985) *with In re N.S. Garrott & Sons,* 772 F.2d 462, 467 (8th

Cir.1985) (where, under state law, debtor holds property subject to a constructive trust with a duty to reconvey the property to the rightful owner, the estate will generally hold the property subject to the same restriction).

12. The motion for relief from stay is a core proceeding. 28 U.S.C. § 157(b)(2)(G). To the extent Sunkist also seeks to compel immediate payment of the trust proceeds, this case is functionally equivalent to a proceeding to determine whether the debtor may use cash collateral, *see* 11 U.S.C. § 363(c)(2); *In re Sacerdote,* 74 B.R. 487 (Bankr.E.D.Pa. 1987), which is also a core matter. *See* 28 U.S.C. § 157(b)(2)(M).